IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MYLAN PHARMACEUTICALS INC., <br> 781 Chestnut Ridge Road <br> Morgantown, WV 26505 <br><br> Plaintiff, <br><br> v. <br><br> KATHLEEN SEBELIUS, <br> in her official capacity as <br> SECRETARY OF HEALTH AND <br> HUMAN SERVICES, <br> 200 Independence Avenue, S.W. <br> Washington, DC 20204, and <br><br> MARGARET HAMBURG, M.D., <br> in her official capacity as <br> COMMISSIONER OF FOOD AND DRUGS, <br> 10903 New Hampshire Ave. <br> Rockville, MD 20993 <br><br> UNITED STATES FOOD AND DRUG <br> ADMINISTRATION, <br> 10903 New Hampshire Ave. <br> Rockville, MD 20993 <br><br> Defendants. | REDACTED VERSION <br><br> Civil Action No. |

**MYLAN'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff, Mylan Pharmaceuticals Inc. ("Mylan"), by and through counsel, respectfully

submits this memorandum in support of its motion for a preliminary injunction against

Defendants, Kathleen Sebelius, in her official capacity as Secretary of Health and Human

Services, Margaret Hamburg, M.D., in her official capacity as Commissioner of Food and Drugs, and the United States Food and Drug Administration ("FDA").

This action arises out of the FDA's refusal to grant final approval of Mylan's application to market and sell the generic drug modafinil. The FDA's refusal is based on an award of exclusivity to another generic drug company that acquired the holder of the branded drug and related patents. As set forth below, this award of exclusivity was contrary to applicable law and was arbitrary and capricious. It potentially allows the new combined brand-generic drug company to maintain an unending control over the market for generic modafinil. Mylan suffers substantial and irreparable harm every day beyond April 6, 2012 that it is unable to market and sell its product.

## Factual Background

Cephalon, Inc. ("Cephalon") has marketed modafinil tablets under the brand name PROVIGIL® since about 1998. Modafinil is a prescription medicine indicated to improve wakefulness in adult patients with excessive sleepiness associated with narcolepsy, obstructive sleep apnea and shift work disorder.

On December 24, 2002, Mylan submitted to the FDA ANDA No. 76-594 seeking regulatory approval of a generic version of modafinil. See FDCA, 21 U.S.C. § 355(j). In its ANDA, Mylan certified under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV certification") that the manufacture, use or sale of Mylan's modafinil products would not infringe any valid and enforceable claim of Cephalon's U.S. patent RE37,516 ("the '516 patent"), which was listed in FDA's Orange Book for modafinil. Mylan was first to file a Paragraph IV certification for the '516 patent. Ex. 1.

Pursuant to 21 U.S.C. § 355(j)(2)(B), Mylan notified Cephalon of its Paragraph IV certification against the '516 patent on February 12, 2003. On February 28, 2003, Cephalon commenced an action for patent infringement against Mylan based on Mylan's Paragraph IV certification against the listed '516 patent. This action triggered an automatic 30-month stay of final FDA approval of Mylan's ANDA. Mylan's modafinil ANDA received tentative approval from FDA on February 9, 2005.[1]

On August 26, 2005, Mylan filed a motion for summary judgment asserting that the '516 patent was invalid.[2] After that motion was fully briefed, but before the motion was decided, Cephalon and Mylan settled the litigation. Cephalon and Mylan entered into a Settlement Agreement on January 9, 2006 and Cephalon stipulated to the dismissal with prejudice of its case against Mylan on January 11, 2006.

█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████

---

[1] In a letter to Mylan dated April 4, 2012, the FDA confirmed that Mylan's ANDA No. 76-594 is tentatively approved. Ex. 2.

[2] On June 26, 2006 another generic drug company, Apotex, Inc., filed an action seeking a declaratory judgment that the '516 patent was invalid, unenforceable, and not infringed. Apotex also sought a declaratory judgment that its product does not infringe the '346 patent. On March 15, 2011, the U.S. District Court for the Eastern District of Pennsylvania granted summary judgment to Apotex as to noninfringement of the '346 patent. *Apotex, Inc. v. Cephalon, Inc.*, No. 06-2768, slip op. at 1, 8 (E.D. Pa. Mar. 15, 2011) (D.I. 435). On November 7, 2011, the same court found that the '516 patent is invalid and unenforceable. *Apotex, Inc. v. Cephalon, Inc.*, No. 06-2768, 2011 U.S. Dist. LEXIS 125859, at *85 (E.D. Pa. Nov. 7, 2011). And, on March 28, 2012, the court found that the '516 patent was not infringed by Apotex's product. *Apotex, Inc. v. Cephalon, Inc.*, No. 06-2768, 2012 U.S. Dist. LEXIS 43479, at *55 (E.D. Pa. Mar. 28, 2012). Exs. 3, 4 and 5.

On November 20, 2007, Cephalon obtained an additional patent related to PROVIGIL®, U.S. patent 7,297,346 ("the '346 patent"). On information and belief, the FDA received from Cephalon on December 14, 2007, the necessary forms for listing that patent in the Orange Book. Upon information and belief, on that same date the FDA received notices of amendment of two ANDAs directed to generic modafinil products. Upon information and belief, one was an ANDA held by Teva Pharmaceuticals USA, Inc. ("Teva") and the other was an ANDA held by Carlsbad Technology Inc. and its business partner, Watson Pharmaceuticals, Inc. (collectively, "Watson"). Upon information and belief, these ANDAs were amended to contain Paragraph IV certifications to the '346 patent.[3]

Accordingly, at the time of those amendments, upon information and belief, Teva and Watson were first to file Paragraph IV certifications with respect to the newly listed '346 patent and, under the FDA's policy, shared 180-day marketing exclusivity for the '346 patent pursuant to 21 U.S.C. § 355(j)(5)(B)(iv).

The claims of the '346 patent are narrowly directed to a specific formulation of modafinil and do not cover Mylan's generic modafinil product. Mylan filed a Paragraph IV certification to the '346 patent and notified Cephalon of its Paragraph IV certification on February 2, 2011. Ex. 6. Cephalon has not sued Mylan for infringement of that patent or otherwise asserted that Mylan or, to Mylan's knowledge, any other modafinil ANDA filer has or will infringe the patent.

On January 30, 2012, and again on March 30, 2012, Mylan requested that the FDA grant final approval of Mylan's ANDA No. 76-594 so that Mylan could commence selling its generic modafinil product on April 6, 2012 (or earlier under certain circumstances) – the effective date of

---

[3] Mylan has no information or knowledge about the current status of the Watson modafinil ANDA or its patent certification. Statements concerning that ANDA herein were obtained from publicly available documents.

Mylan's license from Cephalon. Exs. 7 and 8. On April 4, 2012, the FDA informed Mylan of its refusal to grant final approval of Mylan's ANDA. The FDA explained the basis for its refusal as follows:

> However, we are unable at this time to grant final approval to your ANDA. Prior to the submission of Mylan's certification to the '346 patent [footnote omitted], another applicant with a substantially complete ANDA for Modafinil Tablets USP, 100 mg and 200 mg, submitted a paragraph IV certification to the '346 patent and complied with the requirements of section 505(j)(2)(B) of the Act. This other applicant also had submitted a substantially complete ANDA with a paragraph IV certification to the '516 patent on the same day as Mylan, i.e., on December 24, 2002 [footnote omitted]. This other ANDA applicant is entitled to 180-day generic drug exclusivity under section 505(j)(5)(B)(iv) of the Act because it is the only applicant that filed a substantially complete ANDA (or supplement) that contained a paragraph IV certification to each patent on the first day on which any such certification was received for each patent.

Ex. 2, second page.

Upon information and belief, the other ANDA applicant to which the FDA referred is Teva. *See* Teva Pharmaceuticals USA, Inc. and Cephalon Inc.'s Complaint for Declaratory and Injunctive Relief filed with this Court on April 3, 2012 (Civ. Action No. 1:12-cv-00512-RWR) at ¶¶ 32-38. Ex. 9. Thus the only obstacle to Mylan's ability to obtain final FDA approval of its ANDA and to commence selling its generic modafinil product on April 6, 2012 is the 180-day exclusivity that the FDA has improperly awarded to Teva.

The FDA's deliberative process appears not to have included consideration of the impact of recent events on the effect of Teva's Paragraph IV certifications. In October 2011, Teva's ultimate parent, Teva Pharmaceutical Industries, Ltd., acquired all of the equity of Cephalon and became Cephalon's corporate parent. Ex. 10 at p. F-17 and Exhibit 8 therein. Teva now has the power to direct all of the actions of Cephalon. All of the directors of Cephalon are now high-ranking officers of Teva. Ex. 10 at p. 84, Ex. 11 at p. 6.

## LEGAL STANDARD

To secure relief, Mylan must show that (1) there is a substantial likelihood of success on the merits; (2) irreparable harm in the absence of a preliminary injunction; (3) a balance of hardships tipping in its favor; (4) and the injunction's favorable impact on the public interest. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

## ARGUMENT

1. **Mylan is Likely to Succeed on the Merits**

    a. **Teva's Paragraph IV Certifications Ceased to Have Legal Effect When Teva Acquired Cephalon**

Mylan is likely to succeed on the merits of its claim that it is entitled to immediate, final approval of its modafinil ANDA. The FDA's refusal to grant Mylan final approval is based solely on its erroneous view that Teva is entitled to 180-day marketing exclusivity based on valid Paragraph IV certifications with respect to both patents listed in the Orange Book, and that it is a first filer on both patents.

The FDA arbitrarily and capriciously erred and misconstrued the applicable provisions of the FDCA (e.g., 21 U.S.C. § 355(j)(5)(B)(iv)) in refusing to grant Mylan final approval of its modafinil ANDA based on 180-day exclusivity awarded to Teva. Upon Teva's acquisition of Cephalon in late-2011, Teva's Paragraph IV certifications with respect to the '516 and '346 patents ceased to have any legal effect and no longer could properly serve as a basis for an award of 180-day exclusivity. When that acquisition occurred, Teva no longer had any adverse relationship with Cephalon but, in fact, assumed control of Cephalon. Upon acquiring such control of Cephalon, Teva no longer had standing to challenge the validity, unenforceability or infringement of patents that it indirectly owns through its wholly owned subsidiary. The

6

Supreme Court has held that the filing of a Paragraph IV certification is an artificial act of patent infringement under 35 U.S.C. § 271(e)(2) and its purpose is to confer the courts with subject matter jurisdiction. *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990). A party cannot "infringe," artificially or otherwise, its own patent (or a patent that it owns indirectly through a controlled corporate affiliate). Thus, once Teva became the indirect owner of the listed patents through its ownership of the patent owner Cephalon, it could no longer "infringe" those patents through a Paragraph IV certification. Moreover, Teva's Paragraph IV certification could no longer confer subject matter jurisdiction on a court. It is well established that a federal court lacks subject matter jurisdiction over a case in which the owner of a patent, or one in privity with the owner, brings a suit challenging enforcement of the patents. In that situation, no adverse legal interests exist, and thus no justiciable controversy exists. In other words, because of control by Teva, any case brought by Cephalon against its parent or sister company would be collusive, lacking parties having adverse legal interests. It is well established that a Court would not have jurisdiction to hear a case in which one party controls the other party. In *Gould v. Control Laser Corp.*, 866 F.2d 1391, 1393-1394 (Fed. Cir. 1989), the Federal Circuit stated:

> By virtue of the settlement agreement, Patlex has become the *dominus litis* on both sides. "It is elemental that there must be parties before there is a case or controversy." *Ellis v. Dyson*, 421 U.S. 426, 434, 44 L. Ed. 2d 274, 95 S. Ct. 1691 (1975).
>
> The fact that seemingly adverse parties appear on two sides of an action is not controlling. If one party is actually and formally in control of the other party, adjudication must be refused.

See also, *S. Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.*, 145 U.S. 300, 301, 36 L. Ed. 712, 12 S. Ct. 921 (1892) ("We cannot, however, consent to determine a controversy in which the plaintiff in error has become the dominus litis on both sides. We

assume that this is not an agreed case gotten up by collusion; but the litigation has ceased to be between adverse parties, and the case therefore falls within the rule applied where the controversy is not a real one."); *accord E. Tenn., Va. & Ga. R.R. v. S. Tel. Co.*, 125 U.S. 695, 696, 31 L. Ed. 853, 8 S. Ct. 1391 (1888). ("If one party is actually and formally in control of the other party, adjudication must be refused."); *United States v. Johnson*, 319 U.S. 302, 304 (1943) ("the judgment will not be allowed to stand where one of the parties has dominated the conduct of the suit by payment of the fees of both"); *Lord v. Veazie*, 49 U.S. 251, 255 (1850).

The D.C. Circuit has recognized that the "legislative purpose underlying paragraph IV is to enhance competition by encouraging generic drug manufacturers to challenge the patent information provided by NDA holders in order to bring generic drugs to market earlier." *Teva Pharms. USA, Inc. v. Leavitt*, 548 F.3d 103, 106 (D.C. Cir. 2008). Adversity between the holder of the approved NDA and related patents and the potential generic competitor is essential to accomplishing this legislative purpose.

A conclusion that Teva is permitted to obtain 180-day exclusivity in this situation would lead to endless game playing and absurd results. Prior to the enactment of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"),[4] it would have meant that an NDA holder could file an ANDA seeking approval of a generic version of its own approved drug. Upon the NDA holder's listing of a patent, it could then have amended its ANDA at the earliest possible date to include a Paragraph IV certification that its own patent was invalid, unenforceable or not infringed and thereby could have obtained 180-day exclusivity to prevent other generic drug companies from competing with its branded product. Such a result

---

[4] As Teva explains in the Complaint it filed in this Court on April 3, 2012, pre-MMA law applies here. Ex. 9 at 7-6, n.2.

8

would frustrate the purpose and intent of the Hatch-Waxman statute, which was designed to encourage generic competition, not to erect artificial barriers to such competition. In passing the Hatch-Waxman statute, "Congress sought to get generic drugs into the hands of patients at reasonable prices – *fast*." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (emphasis added).

Without Teva's Paragraph IV certifications, Mylan would be entitled to immediate final approval of its ANDA. Mylan would be a first filer with a Paragraph IV certification with respect to the '516 patent, and on information and belief, Watson/Carlsbad would be the first filer with a paragraph IV certification with respect to the '346 patent.[5] In that situation, the FDA has adopted a policy known as "shared exclusivity," in which the first filer(s) on one patent would share exclusivity with the first filer(s) on the other patent, thus allowing all first filers to be approved. *See, e.g., Apotex, Inc. v. FDA*, 414 F. Supp. 2d 61, 74-76 (D.D.C. 2006); *Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day (July 2003)* (Ex. 12). Application of that policy in this case, in the absence of a paragraph IV certification by Teva, would result in Mylan's receiving immediate final approval.

### b. Mylan was First to File on the '516 Patent

A separate and independent basis for Mylan's request for immediate final FDA approval of its modafinil ANDA is that Mylan was, in fact, the sole first filer with regard to the '516 patent. Mylan's ANDA is the first ANDA that was actually submitted to FDA containing a Paragraph IV certification challenging the '516 patent. Mylan's hand-delivered modafinil ANDA was time-stamped and date-stamped as received by FDA at 7:02 a.m. on December 24,

---

[5] *See* f.n. 3.

2002. Ex. 13. No other applicant submitted an ANDA for modafinil to FDA on December 24, 2002 before Mylan did. However, three other generic drug companies, Teva, Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy"), and Barr Laboratories ("Barr"), also filed ANDAs with Paragraph IV certifications against the '516 patent later in the day on December 24, 2002.

The FDA policy in existence on December 24, 2002 was to grant first-filer status to the first ANDA application actually filed. Thus under the FDA policy at the time Mylan prepared its ANDA, developed its defenses to the '516 patent and filed its ANDA on December 24, 2002, Mylan was considered the only company to have first-filer status on the '516 patent.

The first ANDA applicant to file a paragraph IV certification against a listed patent is awarded a period of "180-day generic exclusivity" for the drug. During this six-month period time frame it is the only company that can market a generic version of that drug. The applicable statute operates by preventing FDA from approving generic competitors during the exclusivity period. FDCA, 21 U.S.C. § 355(j)(5)(B)(iv).

Mylan is the only true "first-to-file" applicant on the '516 patent. From 1984 until 2003, FDA's interpretation of the 180-day generic exclusivity statute, and the agency's practice, was to award exclusivity to the one, true first-to-file applicant. However, on July 31, 2003 – *after* submission of Mylan's ANDA – the FDA issued a ruling granting "shared" 180-day exclusivity for modafinil to "multiple first applicants," and a guidance document describing its new policy. Ex. 14. Under that policy, FDA arbitrarily and capriciously departed from the policy that had been in effect when Mylan prepared, delivered and filed its ANDA and destroyed the value of Mylan's expected first-to-file status by retroactively granting shared 180-day marketing

exclusivity to Mylan, Ranbaxy, Teva, and Barr. Ex. 12. Thus pursuant to the amended FDA policy those four companies share exclusivity with respect to the '516 patent.[6]

FDA's failure to apply the policy in existence at the time that Mylan and the ANDA applicants filed their ANDAs was arbitrary, capricious, and contrary to law. The applicable statutory provision is unambiguous. It reads:

> If the application containing a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous applicant has been submitted [containing] such a certification, the application shall be made effective not earlier than one hundred eighty days thereafter....

21 U.S.C. § 355(j)(5)(B)(iv) (2002). There can be no dispute that Mylan's application was a "previous application [that] has been submitted containing a [Paragraph IV] certification." Therefore, pursuant to the express language of the statute and the FDA policy in effect at the time, FDA was precluded from approving any subsequent ANDAs until expiration of Mylan's 180-day exclusivity. FDA's April 4 letter decision violates the basic tenet of statutory interpretation that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *see also, e.g., Carcieri v. Salazar*, 129 S. Ct. 1058, 1063 (2009).

If Mylan had properly been recognized as the sole first filer with respect to the '516 patent, then Mylan's exclusivity would block approval of Teva's (and others') ANDAs and Mylan and Watson would have mutually blocking exclusivities, leading to a shared exclusivity held by Mylan and Watson.[7]

---

[6] *See* f.n. 3.

[7] *See* f.n. 3.

### c.  Teva's ANDA Was Abandoned and Does Not Provide a Basis for Exclusivity

Further, by not finding that Teva effectively abandoned its ANDA, the FDA acted contrary to its own regulation, and thus arbitrarily and capriciously. In its March 28, 2012 letter to Teva, the FDA stated that "(1) Teva has not filed a submission to its ANDA for modafinil tablets since 2009, (2) it has not requested final approval of its ANDA, and (3) it has not provided FDA with any indication that, in light of its purchase of the RLD, it ever intends to seek approval of its ANDA." Ex. 15 at 2. Further to the FDA's comment, since March 30, 2012, Teva has been on the market, selling an authorized generic modafinil product under Cephalon's NDA. Teva does not need approval of its own ANDA to enter the marketplace because it has access to the branded product through its subsidiary, which it sells as a generic. Thus, it is not surprising that Teva has no interest in obtaining approval of its ANDA and has abandoned it.[8] Under those circumstances, the FDA action was contrary to its own regulation that states:

> For purposes of paragraph (c)(1) of this section, if FDA concludes that the applicant submitting the first application is not actively pursuing approval of its abbreviated application, FDA will make the approval of subsequent abbreviated applications immediately effective if they are otherwise eligible for an immediately effective approval.

21 CFR § 314.107(c)(3). If FDA had followed that regulation, it would have effectively removed Teva as a first filer with respect to both patents. As a result, Mylan would be the first filer with a Paragraph IV certification with respect to the '516 patent, and on information and belief, Watson would be the first filer with a Paragraph IV certification with respect to the '346

---

[8] In its Motion for a Temporary Restraining Order against FDA recently filed with this Court, Teva disingenuously argues that it has in fact requested FDA approval of its ANDA. Ex. 17 at pp. 1-2. What Teva refers to is a rushed letter to the FDA on March 30, 2012—two days *after* the FDA pointed out that Teva had never requested such approval. The last minute letter was an obvious and meaningless attempt to patch up the infirmity in Teva's position pointed out by the FDA.

patent. That exclusivity "standoff" would result in Mylan's receiving immediate final approval by virtue of its first filer status with respect to the '516 patent.

### 2.     Mylan Will be Irreparably Harmed in the Absence of an Injunction

Mylan will be irreparably harmed in the absence of an injunction. Mylan has expended tremendous resources in the development and approval of its modafinil product, including millions of dollars on materials, studies, overhead and litigation. As a result of its investment, Mylan is ready to market its modafinil product. Exhibit 16, ¶3. Any delay in approval of Mylan's ANDA would undermine the value of Mylan's significant investments in its modafinil product. Id., ¶¶5, 9-10. According to public sources, Cephalon's annual U.S. sales of Provigil® exceed $1.1 billion. Id. ¶4. If permitted to launch immediately, Mylan expects to capture a substantial percentage of modafinil product sales. Id. Every day of delay results in lost sales, diminished share of sales and loss of customer goodwill. Id.

As Teva acknowledged in its injunction papers recently filed with this Court, securing customers and distribution channels, entering into long-term sales agreements and strengthening relationships are critical to the generic drug business, and once those opportunities are lost, they cannot be regained. See, Exhibit 9 at 44.

There will be considerable disadvantages if Mylan misses out on the opportunity to be among the first generics on the market. Such losses include, but are not limited to, significant lost profits and sales across all dosage strength lines for the generic product; an accompanying decrease in overall share of sales; decreased access to important customers; loss of customer goodwill; and diminished reputation. Ex. 16, at ¶5.

FDA's failure to grant Mylan final approval so that it can launch its generic modafinil

products this week, while granting Teva 180-day sole marketing exclusivity, has caused and will continue to cause Mylan to suffer additional irreparable financial and other harms. In the absence of a court order, Mylan will not be able to recoup these losses when it enters the market after Teva's exclusivity period expires. Share of sales, revenues and profits are greatest when a manufacturer is the first, or among the first, to launch a generic product. Share, revenues and profits decrease dramatically as other competitors enter the market. *Id.* ¶5.

Mylan also will be harmed because it has committed resources to meet the expected demand for generic modafinil at the expense of other products. That investment, which included rearranging manufacturing priorities, postponing the production of other products, and committing additional manpower and supplies necessary for the manufacture – will be for naught, particularly if Mylan's approval is delayed. *Id.* ¶9.

Delay in approval of Mylan's ANDA also means that portions of the inventory Mylan manufactured to meet the anticipated demand will age, and Mylan will bear additional manufacturing, shipping and storage costs associated with those units. These increased costs may translate into a loss of revenue and overall share of sales, which will put Mylan at a competitive disadvantage. *Id.* ¶10.

Further, the government's sovereign immunity would preclude Mylan from recovering monetary damages from defendants in the event this Court later overturns the FDA's ruling. *See, e.g., Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004) (injunctive relief warranted because "plaintiff will be unable to sue to recover any monetary damages against either Freddie Mac or OFHEO"); *Bracco Diagnostics v. Shalala*, 963 F. Supp. 20, 28 (D.D.C. 1997) (FDA's immunity from damages means that "there is no adequate compensatory or other corrective relief that can be provided at a later date") (internal quotation

marks omitted); *see also Entergy Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000); *cf. CSX Transp., Inc. v. Williams*, 406 F.3d 667, 674 n.7 (D.C. Cir. 2005).

### 3.     The Balance of Hardships and Public Interest Favor Mylan

The final two factors—the balance of hardships and public interest—likewise favor granting immediate injunctive relief. The FDA would not be harmed by an injunction requiring it to apply Hatch-Waxman in a manner that comports with Congress's intent, its own regulations, and well-established practice. Further, the public would benefit from the requested injunction, because it would presumably allow generic(s) to enter the market immediately with 180-day exclusivity. Unlike Teva and Par, Mylan is not dependent on the brand company, Cephalon, for supply of the product. In contrast, without the injunction, the only ANDA that could possibly be approved would be Teva's (assuming that Teva even pursues such approval). The public interest favors Mylan's position. Here, as a result of FDA's determination, at Teva's behest, that Teva holds sole first-filer exclusivity rights, other generic competitors will be blocked from entering the market for 180 days. Such a result harms the public interest, particularly where it is achieved through one "integrated" entity's – *i.e.*, Teva after acquiring Cephalon -- control of both the brand and generic sides of the market.

While Teva would be disadvantaged by losing its purported exclusivity, that is blunted by the fact that Teva is currently on the market selling an authorized generic; indeed is the only company selling a generic product; and could continue to sell even after entry of the injunction. In any event, any harm to Teva would be greatly outweighed by the harm that Mylan would suffer absent injunctive relief.

### **CONCLUSION**

15

For the reasons stated above, Mylan respectfully requests that the Court grant its motion for a preliminary injunction.

Dated: April 5, 2012

Respectfully submitted,

_____
E. Anthony Figg (#345124)
Glenn E. Karta (#439402)
R. Elizabeth Brenner-Leifer (#461486)
ROTHWELL, FIGG, ERNST & MANBECK PC
607 14th Street, NW, Suite 800
Washington, DC 20005
(202) 783-6040


Attorneys for Plaintiff
MYLAN PHARMACEUTICALS INC.