# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TEVA PHARMACEUTICALS USA, Inc.,<br>        1090 Horsham Road<br>        North Wales, PA  19454<br><br>and<br><br>CEPHALON, INC.,<br>        41 Moores Road<br>        Frazer, PA  19355<br><br>                Plaintiffs,<br><br>        v.<br><br>KATHLEEN SEBELIUS, in her official capacity<br>as Secretary of Health and Human Services;<br>        200 Independence Ave., S.W.<br>        Washington, D.C.  20204<br><br>MARGARET HAMBURG, M.D., in her official<br>capacity as Commissioner of Food and Drugs;<br>        10903 New Hampshire Ave.<br>        Silver Spring, MD  20993<br><br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION,<br>        10903 New Hampshire Ave.<br>        Silver Spring, MD  20993<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## TEVA PHARMACEUTICALS USA, INC. AND CEPHALON, INC.'S
## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Teva Pharmaceuticals USA, Inc. ("Teva USA") and Cephalon, Inc. ("Cephalon") (collectively, "Plaintiffs") bring this complaint for declaratory and injunctive relief against defendants Kathleen Sebelius, in her official capacity as

## NATURE OF THE ACTION

1.      Plaintiffs bring this lawsuit to vindicate their statutory rights under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355 *et seq.* ("the FDCA" or "the statute"), FDA's implementing regulations, and well-established Agency practice.

2.      In particular, Teva USA alone is entitled to a statutory 180-day period of marketing exclusivity for its 100 mg and 200 mg generic modafinil (PROVIGIL®) tablets, the brand-name version of which is marketed by Cephalon, by virtue of its status as the only applicant that submitted an Abbreviated New Drug Application ("ANDA") containing the first-filed Paragraph IV certifications to both of the PROVIGIL® patents listed in the *Approved Drug Products with Therapeutic Equivalence Evaluations*, which commonly is called "the Orange Book."  *See* 21 C.F.R. § 314.94(a)(12); 21 C.F.R. § 314.53(f).

3.      Despite well-settled statutory, regulatory, administrative, and judicial precedent confirming Teva USA's right to sole marketing exclusivity, FDA has signaled that it may seek to approve competing applicants for generic modafinil products as early as April 6 and notwithstanding Teva USA's right to sole marketing exclusivity.   FDA's actions fundamentally would undermine the congressionally ordained incentive scheme for generic market entry, to the detriment of pharmaceutical manufacturers, public and private insurers, and the millions of Americans who depend on safe and affordable generic medicines.

4.      FDA's failure to adhere to the statutory mandates, its own regulations, and its past administrative decisions irreparably would divest Teva USA of its

statutory entitlement to marketing exclusivity and expose Cephalon to unlawful competition for which there is no adequate remedy at law. *See, e.g., Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1311 (D.C. Cir. 2010); *id.* at 1312 (citing *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493 (D.C. Cir. 1996) (itself quoting *El Paso Natural Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995)). Immediate judicial review, including injunctive and declaratory relief, thus is essential to preserve Teva USA's statutory right to marketing exclusivity and protect Cephalon from unlawful competition.

5.    As this Court repeatedly has recognized, loss of the first generic applicant's 180-day exclusivity right is truly irreparable: "Once the statutory entitlement has been lost, it cannot be recaptured." *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (quoting *Apotex, Inc. v. FDA*, No. Civ. A. 06-627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006), *aff'd* No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006)). Moreover, given the significance of the product at issue here--annual PROVIGIL® sales exceed $1.1 billion--the losses attributable to the deprivation of Teva USA's right to exclusivity will be both substantial and irrecoverable by virtue of FDA's sovereign immunity.

6.    Cephalon's imminent and irreparable harm is no less severe: If FDA continues on its current course, multiple ANDA applicants (other than Teva USA) unlawfully will be allowed to enter the market and begin competing with Cephalon's brand-name and authorized generic PROVIGIL® products as early as April 6, diminishing Cephalon's market share with respect to its authorized generic

3

product and imposing substantial damages.   As with Teva USA, however, the government's sovereign immunity will preclude Cephalon from recouping damages from the Defendants.

7.     In short, the Agency's actions are beyond its statutory authority, are arbitrary, capricious, and an abuse of discretion and otherwise not in accordance with law.   Plaintiffs therefore ask this Court to enter an order declaring that Teva USA is the only ANDA applicant entitled to 180-day exclusivity for generic versions of PROVIGIL® (modafinil) under the Hatch-Waxman Act and enjoining defendants from approving any ANDA referencing PROVIGIL® other than Teva's ANDA until the conclusion of Teva USA's 180-day exclusivity period.

## PARTIES

8.     Plaintiff Teva USA is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.   Teva USA is a wholly-owned, indirect subsidiary of Teva Pharmaceutical Industries Ltd. ("Teva Limited"), a global pharmaceutical company organized under the laws of Israel with its principal place of business in Israel.   Teva USA distributes the finished pharmaceutical products of Teva Limited in the United States and is an industry leader in the development, manufacture, and marketing of generic pharmaceuticals in the United States.

9.     Plaintiff Cephalon is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.  Cephalon is a wholly-owned, indirect subsidiary of Teva Limited, acquired in late 2011, and manufactures and distributes brand-

name pharmaceutical products in the United States and elsewhere around the world.[1]

10.    Defendant Kathleen Sebelius is the Secretary of Health and Human Services ("HHS") and is the official charged by law with administering the FDCA. Secretary Sebelius is sued in her official capacity.  She maintains offices at 200 Independence Ave., S.W., Washington, DC 20204.

11.    Defendant Margaret Hamburg, the Commissioner of the FDA, has the delegated authority to administer the drug approval provisions of the FDCA. Commissioner Hamburg is sued in her official capacity.  She maintains offices at 200 C St., S.W., Washington, DC 20204, and 5600 Fishers Lane, Rockville, MD 20857.

---

[1]    The Federal Trade Commission ("FTC") extensively reviewed Teva Limited's acquisition of Cephalon and conditioned its approval of the transaction on, among other things, the entry of a supply agreement under which Cephalon would supply another company (Par Pharmaceutical, Inc., or "Par") with finished product for sale as an "authorized generic" version of PROVIGIL® and allow Par to enter the market with that product on April 6, 2012.  Teva Limited and Cephalon have complied fully with the terms of the FTC clearance and the Par supply agreement, and because Par's product will be marketed under Cephalon's NDA for PROVIGIL® (rather than an ANDA) the outcome of this litigation will have no impact on Par's ability to enter the market with its authorized generic version of PROVIGIL® on April 6.  For the same reasons, this litigation has no impact on Cephalon's ability to market its own authorized generic version of PROVIGIL® under the PROVIGIL® NDA, as Cephalon began doing last week. Accordingly, and regardless of the outcome here, two generic versions of PROVIGIL® will be on the market as of April 6.

12.     Defendant FDA is the agency within HHS charged with overseeing, *inter alia,* the human drug approval process, including the portions of that process relevant to this case.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. This action arises under the FDCA, 21 U.S.C. §§ 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman"), *codified at, inter alia,* 21 U.S.C. § 355; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 555, 702, and 706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## FACTUAL ALLEGATIONS

### The Statutory Framework

15.     As modified by the Drug Price Competition and Patent Restoration Act of 1984 (the "Hatch-Waxman Act"), the Food, Drug, and Cosmetic Act (the "FDCA") establishes the procedure for obtaining approval to market pharmaceutical products in the United States. *See* 21 U.S.C. § 355.[2] To obtain approval for a brand-name

---

[2]   The FDCA has subsequently been amended by the Medicare Modernization Act of 2003 (MMA), and the Food and Drug Administration Amendments Act of 2007 (FDAAA), but those amendments have no bearing on this case. *See* MMA, Pub. L. No. 108-173 § 1102(b)(1); *see also* Letter from G. Buehler to ANDA Applicants for Topiramate Sprinkle Capsules, ANDA Nos. 76-448 and 77-868, at 4 (Apr. 15, 2009) (holding that the pre-MMA exclusivity provisions control when (as here) the first generic application (an "ANDA") was submitted prior to the MMA's effective date, even if subsequent ANDAs and Paragraph IV certifications are
(Continued...)

drug like PROVIGIL®, the FDCA requires its manufacturer to prepare and submit a complete New Drug Application ("NDA") that contains, among other things, extensive scientific and clinical data demonstrating the safety and effectiveness of the proposed new drug. *See id.* § 355(b)(1). The NDA must also include information about each patent the applicant asserts as claiming that drug. *See id.* § 355(b)(2); *see also* 21 C.F.R. § 314.50(h); *id.* § 314.53(b).

16.   Prior to Hatch-Waxman's passage, generic manufacturers generally were required to complete a full NDA in order to obtain approval for a proposed generic drug—even though generic drugs contain the same active ingredients, and provide the same therapeutic value, as their brand-name counterparts. As a result, generic market entry often was cost-prohibitive, and patients lacked widespread access to generic medicines that typically are sold at lower, more competitive prices to consumers, private insurers, and public insurers.   In 1984, Congress enacted Hatch-Waxman to remove those barriers to entry, increase the availability of generic drugs, and thereby reduce the average cost of pharmaceuticals. *See, e.g.,* *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (citing *inter alia* H.R. Rep. No. 98-857, pt. 1, at 14 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647)).

---

filed after the MMA's effective date) ("Topiramate Letter Decision") (Exh. A). All citations to statutes and regulations are to the current versions, unless otherwise noted.

17.    To accomplish those goals, Hatch-Waxman permits generic applicants to obtain approval so long as they can show that a proposed generic drug is bioequivalent to a "listed" (or previously approved) drug that FDA already has deemed safe and effective.  Generic applicants do so by submitting an ANDA that includes, among other things, studies showing the proposed generic drug's bioequivalence to the previously approved drug.  21 U.S.C. § 355(j).  If FDA accepts the applicant's bioequivalence studies, the generic applicant need not repeat the safety and efficacy studies that were conducted on the brand-name drug.  *Id.* § 355(j)(2)(A); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1063 (D.C. Cir. 1998).

18.    To balance the public's interest in generic market entry against the intellectual-property rights of NDA holders, Congress added two requirements to the Hatch-Waxman regime.  First, it granted brand manufacturers a regulatory exclusivity period (commonly called "data exclusivity") which precludes a generic applicant from even submitting an ANDA referencing the branded product during the five-year period following FDA's initial approval of the referenced NDA (unless the ANDA challenges one of the brand manufacturer's patents, in which case the ANDA may be submitted after four years).  21 U.S.C. § 355(j)(5)(F)(ii).  That provision ensures that a brand manufacturer who performs the extensive clinical work necessary to secure NDA approval will have an opportunity to recoup its investment regardless of whether or not its branded product is protected by patent.

19.    Second, Congress recognized the importance of the brand manufacturer's patent rights, by requiring each ANDA to include a "certification" for every patent the brand manufacturer has identified as claiming the referenced NDA product, including any patents that the brand manufacturer obtains after the initial NDA approval. *Id.* § 355(j)(2)(A)(vii); *see also Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1350-51 (Fed. Cir. 2003). To make this patent certification system work, the statute requires brand manufacturers to submit to FDA "the patent number and the expiration date of any patent which claims the[ir] drug ... or ... a method of using such drug," 21 U.S.C. § 355(b)(1), and obligates FDA to "publish," "make available to the public," and regularly "revise" a list of the patent information it receives, *id.* § 355(j)(7)(a)(i)-(iii). FDA does so in a compilation known colloquially as "the Orange Book." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004); *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 580 (D.C. Cir. 2001).

20.    Because the Agency lacks patent-law expertise, it plays only a "ministerial role" in maintaining the Orange Book's patent listings. *See, e.g., Apotex*, 347 F.3d at 1347, 1349-50; *see also* 21 C.F.R. § 314.53(f). As a result, generic applicants must submit "an appropriate certification for each listed patent," even if they disagree about "the correctness of the patent information" "published by FDA in the list." 21 C.F.R. § 314.53(f); *see also Apotex*, 347 F.3d at 1350; *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 31 (D.D.C. 2006). Four such certifications are available:

(I) that patent information has not been filed with respect to the referenced NDA [a "Paragraph I certification"],

(II) that the patent identified as claiming the referenced NDA has expired [a "Paragraph II certification"],

(III) that the generic drug will not be marketed until the date on which the patent identified as claiming the referenced NDA will expire [a "Paragraph III certification"], or

(IV) that the patent identified as claiming the referenced NDA is invalid or will not be infringed by the manufacture, use, or sale of the proposed generic drug [a "Paragraph IV certification"].

21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV).

21.     Paragraph IV certifications play a critical role in the statutory scheme. Such certifications demonstrate the applicant's intent to challenge the brand manufacturer's patent monopoly, and thus create a possibility that generic competition might begin before the patent's scheduled expiration. *See, e.g., Teva Pharms. USA, Inc. v. Leavitt*, 548 F.3d 103, 106 (D.C. Cir. 2008) ("*Teva v. Leavitt*") ("The legislative purpose underlying paragraph IV is to enhance competition by encouraging generic drug manufacturers to challenge the patent information provided by NDA holders in order to bring generic drugs to market earlier."). But filing a Paragraph IV certification carries significant risks.

22.     Paragraph IV challengers must invest significant resources to identify weaknesses in a competition-blocking patent and develop a non-infringing alternative or legal defense based on patent invalidity or unenforceability. If those efforts succeed and the applicant attempts to break the patent logjam by filing a Paragraph IV certification, the very act of submitting that certification is an "artificial" act of patent infringement that could require the applicant to spend

10

years defending its actions in costly patent litigation. *See* 35 U.S.C. § 271(e); *see also Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990).  Indeed, if the brand manufacturer sues the applicant within 45 days of receiving notice of the applicant's Paragraph IV certification, FDA may not approve the applicant's ANDA for 30 months (while the patent case unfolds).  21 U.S.C. § 355(j)(5)(B)(iii).  This period of delay is known as the "30-month stay."  *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009).

23.    To encourage generic manufacturers to undertake those investments and accept those risks, Hatch-Waxman typically offers a significant "reward" to the first Paragraph IV challenger: a 180-day exclusivity period during which it is entitled to market its ANDA product without competition from subsequent ANDA applicants.  *See, e.g., Teva v. Leavitt*, 548 F.3d at 104 ("Marketing exclusivity is valuable, designed to compensate manufacturers for research and development costs as well as the risk of litigation from patent holders."); *see also Purepac*, 354 F.3d at 879.  This 180-day "exclusivity period" not only provides the first applicant with a window to sell its products without generic competition, but enables that applicant to establish long-term distribution arrangements with wholesalers and retailers before its competitors enter the marketplace.  For this reason, 180-day exclusivity can be worth literally hundreds of millions of dollars in cases involving drugs like PROVIGIL®, for which Cephalon's annual brand-name sales exceed $1 billion.  *See* Declaration of Maureen Cavanaugh (the "Cavanaugh Decl.") at ¶ 5 (Exh. B).

24.     Under the version of Hatch-Waxman that applies here, that 180-day period begins to run on the earlier of (a) the date on which the first applicant first begins to sell its approved generic product (the "commercial marketing trigger"), or (b) the date of a court decision holding that the patent grounding the first applicant's exclusivity was invalid, not infringed, or otherwise unenforceable ("the court decision trigger").  21 U.S.C. § 355(j)(5)(B)(iv) (2002); *see also Apotex*, 2006 WL 1030151, at *1 n.1.

### Patent-Based Approach And Shared Exclusivity

25.     Many brand-name drugs contain multiple patents and, under the FDCA's exclusivity provisions, an ANDA applicant is eligible for a period of marketing exclusivity if it was the first applicant to file a Paragraph IV certification for a particular patent.   From the outset of the Hatch-Waxman Act, FDA consistently has recognized that the statute thus creates a "patent-by-patent" exclusivity regime under which each challenged patent gives rise to its own exclusivity right.

26.     More specifically, the operative version of the statute creates 180-day exclusivity through the ANDA approval-timing provision set forth at 21 U.S.C. § 355(j)(5)(B)(iv) (2002) (emphasis added), which provides:

> If [an ANDA] contains *a certification described in subclause (IV) of paragraph (2)(A)(vii)* and is for a drug for which a previous [ANDA] has been submitted under this subsection *[containing] such a certification*, the [ANDA] shall be made effective not earlier than one hundred and eighty days after [the commercial marketing or court decision trigger], whichever is earlier.

In turn, the cross-referenced "subclause (IV) of paragraph (2)(A)(vii)" requires ANDA applicants to submit "a certification ... with respect to *each patent* ... that *such patent* is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." *Id.* § 355(j)(2)(A)(vii)(IV) (2002) (emphasis added); *see also Estate of Leder v. Comm'r of IRS*, 893 F.2d 237, 241 (10th Cir. 1989) (where one section of statute "specifically cross references" another, "Congress ... meant to construe [the two] sections ... *in pari materia*"); *State of Georgia v. Shalala*, 8 F.3d 1565, 1571-73 (11th Cir. 1994) (same).

27.   As the statute's cross-reference to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) makes clear and FDA's longstanding regulations confirm, 180-day exclusivity therefore is *patent-specific*—meaning that the first challenger to *each* listed patent can become eligible for 180-day exclusivity, rather than merely the first challenger to *any* listed patent. *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002); *see also* 21 C.F.R. § 314.107(c)(1)-(2).   FDA consistently has recognized this feature of the statute in administrative rulings for more than a decade. *See, e.g.*, Letter from J. Woodcock to R. Green, S. Sklar and K. Beardsley, Dkt. No. 99P-1271/PSA1 & PSA2 (Aug. 2, 1999) (Exh. C) ("Cisplatin Letter Decision"); Letter from G. Buehler to M. Macdonald, ANDA No. 75-356, at 2 (July 30, 2003) ("Paroxetine Letter Decision") ("In other words, the first applicant with a paragraph IV certification for each listed patent [is] separately eligible for 180-day eligibility for exclusivity based on that patent.") (Exh. D); Letter from G. Buehler to D. Servello, ANDA No. 75-347, at 2 (Nov. 16, 2001) ("Omeprazole Letter Decision") (same) (Exh. E). And FDA's "patent-

by-patent" interpretation of the statute has been upheld in court. *See Apotex, Inc. v. FDA*, 226 Fed. App'x 4 (D.C. Cir. 2007), *aff'g* 414 F. Supp. 2d 61 (D.D.C. 2006).

28.     One feature of the patent-by-patent approach is that multiple applicants may have competing claims to exclusivity. An ANDA applicant must certify not only to patents listed in the Orange Book at the time the applicant submits its ANDA, but also to any applicable patents that may be listed thereafter. *See Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1350-51 (Fed. Cir. 2003).[3] Because NDA holders are required to constantly update patent information--including submitting new patent information after the NDA is approved--an ANDA applicant who filed the first Paragraph IV ANDA with respect to a particular listed drug may not be the first to certify to ***all*** the patents listed in connection with that drug. In some cases, other applicants will file Paragraph IV certifications for later-listed patents relating to the same listed drug before a previous ANDA first-filer has had an opportunity to amend its ANDA to include a certification to the newly listed patent. As a result, there may be multiple "first" Paragraph IV filers with respect to the same approved drug product, based on first-to-file certifications regarding different patents.

29.     As FDA long ago recognized, one consequence of that approach could be that no ANDA applicant could be approved. FDA faced precisely that situation

---

[3]   NDA holders are required by statute to submit patent information with their original NDA submission and, in addition, after the NDA is approved if the patent information was not available when the application was filed. 21 U.S.C. 355(b)(1) & (c)(2).

in 2001, when it addressed exclusivity for generic omeprazole products, sold under the brand name Prilosec®. *See* Omeprazole Letter Decision at 1 (Exh. E). One company, Andrx, had filed the first Paragraph IV certification on seven patents. *Id.* A second company, Genpharm, had filed the first Paragraph IV certification on three other patents. *Id.* As the Agency realized, if a rigid patent-based approach to exclusivity were used, Andrx's and Genpharm's first applicant status with respect to different patents would have resulted in a "standoff": Andrx could not be given final approval until Genpharm's exclusivity as to certain patents had run; Genpharm could not be given final approval until Andrx's exclusivity for other patents had run.

30.    FDA resolved that situation by adopting a policy known as "shared exclusivity," pursuant to which qualifying ANDA applicants (*i.e.*, those that had filed the first Paragraph IV certification for a particular patent) would be eligible to "share" the generic exclusivity period while approval of the remaining ANDA applications would be delayed until 180 days after exclusivity was triggered. *See id.* at 2-3. FDA has since issued several letter decisions relating to subsequent shared exclusivity situations involving various generic drugs, and it continuously and consistently has applied that policy to resolve exclusivity "standoffs" like the one in omeprazole.

31.    At the same time, however, FDA repeatedly has made clear that shared exclusivity is appropriate *only* where "two applicants have submitted paragraph IV certifications to two different patents, and one applicant was first to

file a paragraph IV certification on one patent and the other was first to file on a different patent." Letter from K. Webber to W. Shultz, R. Dormer and K. Karst, ANDA No. 77-344, at 11 (Sept. 17, 2010) ("Donepezil Letter Decision") (Exh. F). By contrast, when one applicant is the first to file on each of the patents claiming the NDA product, and other applicants are not, there is no need to utilize the shared exclusivity regulatory resolution, because the applicant that was first to file "is not blocked by any other ANDA's exclusivity." *Id.* at 12 n.18. In those circumstances, the Agency has declared shared exclusivity to be inappropriate and inconsistent with the statute, and it consistently awards sole exclusivity to the applicant that was first to file on each of the patents. *Id.*

### Facts Related to Modafinil

32.   Modafinil is a prescription medicine used to improve wakefulness due to narcolepsy, obstructive sleep apnea, and shift work disorder. Cephalon holds an approved NDA relating to modafinil, No. 20-717, which it commercially markets under the brand name PROVIGIL®. Cephalon has listed two patents in connection with its PROVIGIL® product: U.S. Patent No. RE37516 ("the '516 patent"), which blocks generic competition through April 6, 2015; and U.S. Patent No. 7,297,346 ("the '346 patent"), which blocks generic competition through May 29, 2024.

33.   On December 24, 2002, Teva USA submitted an ANDA seeking FDA approval to market a generic version of PROVIGIL® 100 mg and 200 mg tablets. FDA accepted Teva USA's generic PROVIGIL® ANDA for filing on that day, and docketed it as ANDA No. 76-596. *See* Letter from W.P. Rickman to P. Erickson (Feb. 6, 2003) (Exh. G). Teva USA's ANDA contained a Paragraph IV certification

to the '516 patent, claiming that that patent is invalid, unenforceable, and/or would not be infringed by Teva USA's proposed generic drug product. *Id.* That same day, three other companies—Mylan Pharmaceuticals Inc. ("Mylan"), Ranbaxy Laboratories Ltd. ("Ranbaxy"), and Barr Laboratories, Inc. ("Barr")—also submitted ANDAs referencing PROVIGIL®, and their ANDAs likewise included Paragraph IV certifications to the '516 patent.   Under the well-settled exclusivity principles discussed above, each of these four companies—Teva USA, Mylan, Ranbaxy, and Barr—is a co-first challenger to the '516 patent based on their same-day Paragraph IV certifications to that patent.

34.     On November 20, 2007, Cephalon obtained a second patent related to PROVIGIL®, the '346 patent, which was scheduled to block generic competition through May 29, 2024.  On December 13, 2007, Cephalon submitted a Form 3542 for the '346 patent, and the FDA received and date-stamped that form on December 14, 2007, meaning that the first day that a valid Paragraph IV certification to the '346 patent could have been received by the Agency was December 14, 2007. *See* Letter from J. Ciciriello to R. Katz (Dec. 13, 2007) (Exh. H); Email from M.A. Holovac to R. Hrubiec & R. Zakreski (Jan. 24, 2008) ("The date stamp date ... is 12/14/2007.") (Exh. I).  Accordingly, the first date on which FDA could have received a valid Paragraph IV certification to the '346 patent was December 14, 2007. *See* 21 C.F.R. § 314.53(d)(5) ("Patent information shall be considered to be submitted to FDA as of the date the information is received by the Central Document Room."); *see also Teva v. Leavitt*, 548 F.3d at 108 ("[B]oth the statute and the Agency's

policies compel FDA to rely on the actual status of a patent (as indicated by the NDA holder) and … the Agency has consistently required ANDA applicants to certify to patents recently submitted to FDA.").

35.    On that same date, FDA received notice of an amendment to Teva USA's above-referenced ANDA that contained a Paragraph IV certification to the '346 patent. *See* Letter from P. Erickson to G. Buehler (Dec. 13, 2007) & Federal Express bill reflecting Dec. 14, 2007 delivery to FDA's Document Control Room (Exh. J).  As with its Paragraph IV certification to the '516 patent, Teva USA's Paragraph IV certification to the '346 patent thus was received by FDA on the first date FDA could have received a valid Paragraph IV certification to the '346 patent. In stark contrast to their prompt challenges regarding the '516 patent, however, neither Mylan, nor Ranbaxy, nor Barr submitted a Paragraph IV certification to the '346 patent on December 14, 2007.  Instead, only one other ANDA applicant did so: Carlsbad Technology, Inc. and its business partner Watson Pharmaceuticals, Inc. (collectively, "Watson").

36.    Because Teva USA was the first generic applicant to submit a substantially complete application for generic PROVIGIL® that contained Paragraph IV certifications to both patents that Cephalon had listed in the Orange Book for that drug, Teva USA became eligible for 180-day generic marketing exclusivity with respect to both drugs. *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002). Teva USA's ANDA is not blocked by any other applicant's entitlement to exclusivity, while Teva USA's first-to-file certifications for both listed patents block the approval

18

of every other ANDA for generic modafinil tablets until Teva USA's 180-day exclusivity period concludes. *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002); *see also* Topiramate Letter Decision (holding that the pre-MMA exclusivity provisions control whenever the first ANDA was submitted prior to the MMA's effective date, even if subsequent ANDAs and Paragraph IV certifications are filed after the MMA's effective date) (Exh. A).

### Immediate Judicial Review Of FDA's Refusal To Confirm Teva USA's Sole Exclusivity Period Is Imperative

37.     As set forth above, *supra* ¶ 3, FDA has signaled that it may seek to approve competing applicants for generic modafinil products as early as April 6 and notwithstanding Teva USA's right to sole marketing exclusivity. *See* Letter from K. Webber to M. Goshko, ANDA No. 76-596, at 1-3 (Mar. 28, 2012) ("Webber Letter") (Exh. K).   Immediate judicial review is essential to protect Plaintiffs' interests.

38.     With respect to Teva USA, both this Court and the D.C. Circuit have recognized that loss of the statutory entitlement to 180-day exclusivity is an irreparable harm that warrants prompt injunctive relief. *See, e.g., Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998); *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (citing *Apotex, Inc. v. FDA*, No. Civ. A. 06-627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006), *aff'd*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006)); *Torpharm, Inc. v. Shalala*, No. 97-1925, 1997 WL 33472411, at *4 (D.D.C. Sept. 15, 1997).   Moreover, the deprivation of the 180-day head-start threatens to impose considerable financial losses: If FDA allows Teva USA's ANDA competitors to enter the market despite Teva USA's exclusivity,

Teva USA would lose a significant percentage of its sales to those competitors when it begins marketing its product—even though Congress gave Teva USA *alone* the statutory right to ANDA sales during the first six months after it enters the market—and would be forced to compete against those applicants on price to secure its share of the multi-way market.   Cavanaugh Decl. ¶¶ 21-23 (Exh. B).   Those harms can be especially significant in cases like this one, where more than 60 million PROVIGIL® tablets were dispensed to consumers in 2011 and Cephalon's annual U.S. sales of the product exceeded $1.1 billion.  *Id.* ¶ 5.  Moreover, as noted above, those losses will be irreparable because the government's sovereign immunity would preclude Teva USA from recovering damages from Defendants. *See, e.g., Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004); *see also Entergy Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000); *cf. CSX Transp., Inc. v. Williams*, 406 F.3d 667, 674 n.7 (D.C. Cir. 2005).

39.    The same is true for Cephalon.  On April 6, only two competitors lawfully could begin competing with Cephalon:  Teva USA (assuming the approval of Teva's ANDA) and Par, whose authorized generic version of the product lawfully can compete against both PROVIGIL® and Cephalon's own authorized generic version of the product because it will be marketed under Cephalon's own NDA for PROVIGIL®.  *See supra* at n.1.  But FDA's unlawful approval ANDAs referencing PROVIGIL® in addition to Teva USA's ANDA will impose immediate and irreparable harms on Cephalon—by immediately depriving Cephalon of sales for its authorized generic version of PROVIGIL®, *see* Declaration of Michael Derkacz ¶ 17

(Exh. L), and thus subjecting Cephalon's authorized generic product to additional price competition. *Id.* Cephalon's losses from the entry of additional ANDA products, which are projected to exceed $60 million dollars per quarter, *see id.*, unquestionably are cognizable. *See, e.g., Teva v. Sebelius*, 595 F.3d at 1312 (noting that "the impending prospect of allegedly unlawful competition" is "the same harm that has sufficed for Article-III injury purposes in all of our past drug-approval cases") (citing *Bristol-Myers Squibb*, 91 F.3d at 1497 ("[U]nder what we have termed the 'competitor standing doctrine ... when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause a petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing.'") (itself quoting *El Paso Natural Gas*, 50 F.3d at 27)); *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 n.10 (4th Cir. 2000) ("'[N]umerous cases have found that a firm has constitutional standing to challenge a competitor's entry into its market.'") (quoting *Mova*, 140 F.3d at 1074; citing *Schering Corp. v. FDA*, 51 F.3d 390, 395 (3d Cir. 1995)); *MD Pharm., Inc. v. DEA*, 133 F.3d 8, 11 (D.C. Cir. 1998) (quoting *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 701 (D.C. Cir. 1994)). As in the case of Teva USA, Cephalon will not be able to recover those losses by virtue of the government's sovereign immunity. *Brendsel*, 339 F. Supp. 2d at 66; *Bracco Diagnostics*, 963 F. Supp. at 28; *see also Entergy*, 210 F.3d at 899; *cf. CSX Transp.*, 406 F.3d at 674 n.7.

40.    At bottom, FDA's refusal to award Teva USA sole marketing exclusivity under the Hatch-Waxman Act is contrary to the FDCA, the Hatch-

Waxman Act, FDA regulations and established Agency practice, and thus this Court should declare that Teva USA is the only ANDA applicant entitled to 180-day exclusivity for generic versions of PROVIGIL® (modafinil) under the Hatch-Waxman Act, 21 U.S.C. § 355 *et seq.*, and enjoin Defendants from approving any ANDA referencing PROVIGIL® other than Teva USA's ANDA until the conclusion of Teva USA's 180-day exclusivity period.

## FIRST CAUSE OF ACTION
### (Violation of the FDCA and the APA)

41.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-40 above.

42.    FDA's failure to award Teva USA sole 180-day exclusivity to market generic modafinil tablets is in excess of FDA's statutory authority, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of 5 U.S.C. § 706.

43.    Plaintiffs have raised these issues with FDA, but the Agency nonetheless has signaled that it may seek to approve competing applicants for generic modafinil products as early as April 6 despite Teva USA's right to sole marketing exclusivity.

44.    FDA's failure to adhere to the statutory mandates, its own regulations, and its past administrative decisions irreparably would divest Teva USA of its statutory entitlement to marketing exclusivity and expose Cephalon to unlawful competition with respect to its authorized generic version of PROVIGIL® tablets for which there is no adequate remedy at law.

45.    Neither Defendants nor any other entity will suffer cognizable harm if the relief requested herein is granted, and the public interest will be served by such relief.  Plaintiffs, on the other hand, will suffer substantial and irreparable harm absent the granting of the requested relief, in the form of a lost statutory right, lost sales and decreased market share.  These injuries can never be remediated absent immediate judicial review of FDA's position.

46.    The Agency's actions have caused, are causing, and will continue to cause substantial harm to Teva USA and Cephalon unless and until they are declared unlawful pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the FDCA, and unless and until this Court declares that Teva USA is the only ANDA applicant entitled to 180-day exclusivity for generic versions of PROVIGIL® (modafinil) under the Hatch-Waxman Act and enjoins Defendants from approving any ANDA referencing PROVIGIL® other than Teva's ANDA until the conclusion of Teva USA's 180-day exclusivity period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare that Teva USA is the only ANDA applicant entitled to 180-day exclusivity for generic versions of PROVIGIL® (modafinil) under the Hatch-Waxman Act, 21 U.S.C. § 355 *et seq.*;

B.    Enjoin defendants from approving any ANDA referencing PROVIGIL® other than Teva USA's ANDA until the conclusion of Teva USA's 180-day exclusivity period; and

C.    Provide such further relief as the Court may deem just and proper.

23

A.     Declare that Teva USA is the only ANDA applicant entitled to 180-day exclusivity for generic versions of PROVIGIL® (modafinil) under the Hatch-Waxman Act, 21 U.S.C. § 355 *et seq.*;

B.     Enjoin defendants from approving any ANDA referencing PROVIGIL® other than Teva USA's ANDA until the conclusion of Teva USA's 180-day exclusivity period; and

C.     Provide such further relief as the Court may deem just and proper.

Dated: April 3, 2012                    Respectfully submitted,

_____

Jay P. Lefkowitz, P.C. (449280)
Michael D. Shumsky (495078)
John K. Crisham (486491)
KIRKLAND & ELLIS LLP
655 15th Street N.W., Suite 1200
Washington, D.C.  20005
Tel: (202) 879-5000
Fax: (202) 879-5200

*Counsel for Teva Pharmaceuticals USA, Inc.
and Cephalon, Inc.*

24

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 3rd day of April, 2012, he caused a copy of the foregoing **TEVA PHARMACEUTICALS USA, INC. AND CEPHALON, INC.'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** to be served upon the following attorneys by electronic mail:

Elizabeth Dickinson, Esq.
Chief Counsel, U.S. Food and Drug Administration
Shoshana Hutchison, Esq.
Associate Chief Counsel, Litigation
U.S. Department of Health and Human Services
5600 Fishers Lane
Rockville, MD 20857
(301) 827-8579
Email: Elizabeth.Dickinson@fda.hhs.gov
Email: Shoshana.Hutchison@fda.hhs.gov

Drake Cutini, Esq.
Roger Gural, Esq.
United States Department of Justice
Office of Consumer Litigation
Liberty Square Building
450 5th Street, NW
Room 4600 S
Washington, D.C. 20001
Email: Drake.Cutini@usdoj.gov
Email: Roger.Gural@usdoj.gov
*Counsel for the Federal Defendants*

Michael D. Shumsky

*Counsel for Teva Pharmaceuticals USA, Inc.
and Cephalon, Inc.*

25