# EXHIBIT 16

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, Inc., | ) |
| | ) |
| and | ) |
| | ) |
| CEPHALON, INC., | ) |
| | ) |
|        Plaintiffs, | ) |
| | ) |
|     v. | ) |
| | ) |
| KATHLEEN SEBELIUS, in her official capacity | ) |
| as Secretary of Health and Human Services; | )    Case No. ___ |
| | ) |
| MARGARET HAMBURG, M.D., in her official | ) |
| capacity as Commissioner of Food and Drugs; | ) |
| | ) |
| UNITED STATES FOOD AND DRUG | ) |
| ADMINISTRATION, | ) |
| | ) |
|        Defendants. | ) |
| | ) |

## PLAINTIFFS TEVA PHARMACEUTICALS USA, INC. AND CEPHALON, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs Teva Pharmaceuticals USA, Inc. ("Teva USA") and Cephalon, Inc. ("Cephalon") respectfully submit this motion for a temporary restraining order to ensure meaningful judicial review of Plaintiffs' motion for a preliminary injunction declaring that Teva USA is the only ANDA applicant entitled to 180-day exclusivity for generic versions of PROVIGIL® (modafinil) under the Hatch-Waxman Act, 21 U.S.C. § 355 *et seq.* and enjoining defendants Kathleen Sebelius, in her official capacity as Secretary of Health and Human Services, Margaret Hamburg, M.D., in her official capacity as Commissioner of Food and Drugs, and the United States

Food and Drug Administration (collectively, "FDA") from approving any ANDA referencing PROVIGIL® other than Teva's ANDA until the conclusion of Teva USA's 180-day exclusivity period.

In particular, Plaintiffs request that the Court: (1) enter a temporary restraining order preventing FDA from approving any ANDA referencing PROVIGIL® other than Teva USA's ANDA until the Court resolves Plaintiffs' motion for preliminary injunctive relief; (2) schedule a hearing for the morning of April 6 to address Plaintiffs' motion for preliminary injunctive relief; (3) order FDA to produce its decision regarding Teva USA's exclusivity at that hearing.

The grounds for this motion are set forth in the accompanying Memorandum of Points and Authorities and the Declarations of Maureen Cavanaugh and Michael Derkacz.

Dated: April 3, 2012

/s/ Michael D. Shumsky
Jay P. Lefkowitz, P.C. (449280)
Michael D. Shumsky (495078)
John K. Crisham (486491)
Aaron L. Nielson (D.D.C. Bar pending)
KIRKLAND & ELLIS LLP
655 15th Street N.W., Suite 1200
Washington, D.C.  20005
(202) 879-5000
(202) 879-5200  fax

*Counsel for Teva Pharmaceuticals USA, Inc. and Cephalon, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 3rd day of April, 2012, he caused a copy of the foregoing **MOTION FOR TEMPORARY RESTRAINING ORDER** to be served upon the following attorneys by electronic mail:

Elizabeth Dickinson, Esq.
Chief Counsel, U.S. Food and Drug Administration
Shoshana Hutchison, Esq.
Associate Chief Counsel, Litigation
U.S. Department of Health and Human Services
5600 Fishers Lane
Rockville, MD  20857
(301) 827-8579
Elizabeth.Dickinson@fda.hhs.gov
Shoshana.Hutchinson@fda.hhs.gov

Drake Cutini, Esq.
Roger Gural, Esq.
United States Department of Justice
Office of Consumer Litigation
Liberty Square Building
450 5th Street, NW
Room 4600 S
Washington, D.C. 20001
Drake.Cutini@usdoj.gov
Roger.Gural@usdoj.gov

*Counsel for the Federal Defendants*

/s Michael D. Shumsky
Michael D. Shumsky

*Counsel for Teva Pharmaceuticals USA, Inc. and Cephalon, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 3rd day of April, 2012, he caused a copy of the foregoing **MOTION FOR PRELIMINARY INJUNCTION** to be served upon the following attorneys by electronic mail:

Elizabeth Dickinson, Esq.
Chief Counsel, U.S. Food and Drug Administration
Shoshana Hutchison, Esq.
Associate Chief Counsel, Litigation
U.S. Department of Health and Human Services
5600 Fishers Lane
Rockville, MD  20857
(301) 827-8579
Elizabeth.Dickinson@fda.hhs.gov
Shoshana.Hutchinson@fda.hhs.gov

Drake Cutini, Esq.
Roger Gural, Esq.
United States Department of Justice
Office of Consumer Litigation
Liberty Square Building
450 5th Street, NW
Room 4600 S
Washington, D.C. 20001
Drake.Cutini@usdoj.gov
Roger.Gural@usdoj.gov

*Counsel for the Federal Defendants*

/s Michael D. Shumsky
Michael D. Shumsky
*Counsel for Teva Pharmaceuticals USA, Inc.
and Cephalon, Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, Inc., | ) |
| | ) |
| and | ) |
| | ) |
| CEPHALON, INC., | ) |
| | ) |
|         Plaintiffs, | ) |
| | ) |
|    v. | ) |
| | ) |
| KATHLEEN SEBELIUS, in her official capacity | ) |
| as Secretary of Health and Human Services; | )  Case No. ____ |
| | ) |
| MARGARET HAMBURG, M.D., in her official | ) |
| capacity as Commissioner of Food and Drugs; | ) |
| | ) |
| UNITED STATES FOOD AND DRUG | ) |
| ADMINISTRATION, | ) |
| | ) |
|         Defendants. | ) |
| | ) |

## TEVA PHARMACEUTICALS USA, INC. AND CEPHALON, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR JOINT MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Jay P. Lefkowitz, P.C. (449280)
Michael D. Shumsky (495078)
John K. Crisham (486491)
KIRKLAND & ELLIS LLP
655 15th Street N.W., Suite 1200
Washington, D.C. 20005
Tel: (202) 879-5000
Fax: (202) 879-5200

April 3, 2012

*Counsel for Teva Pharmaceuticals USA, Inc. and Cephalon, Inc.*

## TABLE OF CONTENTS

INTRODUCTION AND REQUEST FOR INTERIM RELIEF TO ENABLE MEANINGFUL JUDICIAL REVIEW ................................................................. 1

BACKGROUND ............................................................................................. 5

    A.    The Hatch-Waxman Framework ......................................................... 5

    B.    Factual Background Relating To Modafinil Drug Products ................ 13

    C.    Procedural Background ...................................................................... 16

LEGAL STANDARD ................................................................................... 18

ARGUMENT ................................................................................................ 18

I.    Plaintiffs Are Likely To Succeed On The Merits. ............................................ 18

    A.    Teva Alone Is Entitled 180-Day Exclusivity Under The Statute's Well-Established "Patent-By-Patent" Exclusivity Regime.................... 19

    B.    There Is No Basis For Applying "Shared Exclusivity" Here. .............. 25

    C.    The Issues FDA Has Raised Are Meritless. ......................................... 31

        1.    FDA's Assertions Regarding The Relationship Between Teva USA and Cephalon Are Both Factually Incorrect And Legally Irrelevant. .............................................................. 31

        2.    FDA's Assertions Regarding The Status Of Teva USA's ANDA Are Both Factually Incorrect And Legally Irrelevant. .................................................................................. 35

        3.    FDA Long Ago Rejected Mylan's Claims Regarding Exclusivity For The '516 Patent................................................. 39

II.    Plaintiffs Will Suffer Irreparable Harm Absent The Entry Of Immediate Injunctive Relief. ............................................................. 43

III.    The Balance Of Hardships And Public Interest Favor The Entry Of Immediate Injunctive Relief. ............................................................. 47

CONCLUSION............................................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Prof'l Hunters Ass'n v. FAA,*
    177 F.3d 1030 (D.C. Cir. 1999) ....................................................................... 23

*Am. Bioscience, Inc. v. Thompson,*
    243 F.3d 579 (D.C. Cir. 2001) .......................................................................... 8

*Am. Fed. of State, County & Municipal Employees Area Council 26  v. FLRA,*
    395 F.3d 443 (D.C. Cir. 2005) .......................................................................... 30

*Apotex, Inc. v. Cephalon, Inc.,*
    No. 2:06-cv-2768 (E.D. Pa. Mar. 28, 2012) ..................................................... 37

*Apotex, Inc. v. FDA,*
    226 Fed. App'x 4 (D.C. Cir. 2007),
    *aff'g* 414 F. Supp. 2d 61 (D.D.C. 2006) ........................................................... 23

*Apotex, Inc. v. FDA,*
    2006 WL 1030151 (D.D.C. Apr. 19, 2006),
    *summarily aff'd,* 449 F.3d 1249 (D.C. Cir. 2006) ............................................. 1

*Apotex, Inc. v. Thompson,*
    347 F.3d 1335 (Fed. Cir. 2003) .................................................................. 8, 25

*Astrazeneca Pharm. LP v. FDA,*
    2012 WL 1037457 (D.D.C. Mar. 28, 2012) ....................................................... 2

*Bracco Diagnostics, Inc. v. Shalala,*
    963 F. Supp. 20, 29 (D.D.C. 1997) ............................................................. 44, 45

*Brendsel v. Office of Fed. Hous. Enter. Oversight,*
    339 F. Supp. 2d 52 (D.D.C. 2004) ............................................................. 45, 47

*Bristol-Myers Squibb Co. v. Shalala,*
    91 F.3d 1493 (D.C. Cir. 1996) ................................................................... 2, 46

*Burnet v. Clark,*
    287 U.S. 410 (1932) ........................................................................................ 32

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.,*
    527 F.3d 1278 (Fed. Cir. 2008) ....................................................................... 37

*CSX Transp., Inc. v. Williams,*
  406 F.3d 667 (D.C. Cir. 2005) ..................................................... 45, 47

*Dole Food Co. v. Patrickson,*
  538 U.S. 468 (2003) .................................................................... 32

*El Paso Natural Gas Co. v. FERC,*
  50 F.3d 23 (D.C. Cir. 1995) ..................................................... 2, 46

*Eli Lilly & Co. v. Medtronic, Inc.,*
  496 U.S. 661 (1990) ...................................................................... 9

*Eli Lilly & Co. v. Teva Pharm. USA, Inc.,*
  557 F.3d 1346 (Fed. Cir. 2009) ................................................... 10

*Entergy Ark., Inc. v. Nebraska,*
  210 F.3d 887 (8th Cir. 2000) ................................................. 45, 47

*Envtl. Action v. FERC,*
  996 F.2d 401 (D.C. Cir. 1993) ..................................................... 30

*Estate of Leder v. Comm'r of IRS,*
  893 F.2d 237 (10th Cir. 1989) ...................................................... 19

*First Nt'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
  462 U.S. 611 (1983) ..................................................................... 32

*Granutec, Inc. v. Shalala,*
  1998 WL 153410, *7 (4th Cir. 1998) ............................................ 34

*Hi-Tech Pharmacal Co. v. FDA,*
  587 F. Supp. 2d 1 (D.D.C. 2008) ................................... 2, 3, 4, 37, 43

*Landgraf v. USI Film Prods.,*
  511 U.S. 244 (1994) ..................................................................... 39

*LaShawn A. v. Barry,*
  87 F.3d 1389 (D.C. Cir. 1996) *(en banc)* ...................................... 31

*MD Pharm., Inc. v. DEA,*
  133 F.3d 8 (D.C. Cir. 1998) ..................................................... 2, 46

*Mova Pharm. Corp. v. Shalala,*
  140 F.3d 1060 (D.C. Cir. 1998) ......................... 1, 2, 7, 18, 34, 43, 46

*Paralyzed Veterans of Am. v. D.C. Arena L.P.,*
  117 F.3d 579 (D.C. Cir. 1997) ..................................................... 23

*Purepac Pharm. Co. v. Thompson,*
    354 F.3d 877 (D.C. Cir. 2004) ..................................................... 8, 10

*Ranbaxy Labs. Ltd. v. Leavitt,*
    469 F.3d 120 (D.C. Cir. 2006) ......................................................... 34

*Sandoz, Inc. v. FDA,*
    439 F. Supp. 2d 26 (D.D.C. 2006) ........................................... 1, 8, 43

*Schering Corp. v. FDA,*
    51 F.3d 390 (3d Cir. 1995) ......................................................... 2, 46

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998) ........................................................ 6

*State of Georgia v. Shalala,*
    8 F.3d 1565 (11th Cir. 1994) ......................................................... 19

*Tax Analysts v. IRS,*
    117 F.3d 607 (D.C. Cir. 1997) ....................................................... 31

*Teva Pharm. USA, Inc. v. Leavitt,*
    548 F.3d 103 (D.C. Cir. 2008) ............................................... 9, 10, 15

*Teva Pharm. USA, Inc. v. Sebelius,*
    595 F.3d 1303 (D.C. Cir. 2010) ...................................... 1, 2, 4, 37, 48

*Teva Pharm. USA, Inc. v. Sebelius,*
    638 F. Supp. 2d 42 (D.D.C. 2009),
    *rev'd on other grounds,* 595 F.3d at 1303 ........................................ 44

*United States v. Bestfoods,*
    524 U.S. 51 (1998) ....................................................................... 32

*Vartelas v. Holder,*
    ___ S. Ct. ___, 2012 WL 1019971 (Mar. 28, 2012) ........................... 38

*Westar Energy, Inc. v. FERC,*
    473 F.3d 1239 (D.C. Cir. 2007) ...................................................... 30

*Zeneca, Inc. v. Shalala,*
    213 F.3d 161 (4th Cir. 2000) ..................................................... 2, 46

**Statutes and Regulations**

21 C.F.R. § 314.107(c) ........................................................... 33, 35

iv

21 C.F.R. § 314.107(c)(1) ................................................................. 20, 21, 40

21 C.F.R. § 314.107(c)(1)(ii) ........................................................................ 20

21 C.F.R. § 314.50(h) ................................................................................... 6

21 C.F.R. § 314.53(b) ................................................................................... 6

21 C.F.R. § 314.53(d)(5) ............................................................................ 14

21 C.F.R. § 314.53(f) ................................................................................... 8

21 U.S.C. § 355 ............................................................................... 5, 23, 38

21 U.S.C. § 355(b)(1) ............................................................................. 6, 8

21 U.S.C. § 355(b)(2) ................................................................................. 6

21 U.S.C. § 355(j) .......................................................................... 7, 23, 38

21 U.S.C. § 355(j)(2)(A) .............................................................................. 7

21 U.S.C. § 355(j)(2)(A)(vii) .................................................................... 8, 9

21 U.S.C. § 355(j)(2)(A)(vii)(IV)(2002) .......................................... 19, 20, 24

21 U.S.C. § 355(j)(4)(B)(iv) ....................................................................... 34

21 U.S.C. § 355(j)(5)(B)(iii) ......................................................................... 9

21 U.S.C. § 355(j)(5)(B)(iv) (2002) .............................. 11, 19, 20, 24, 25, 29, 33, 35, 36

21 U.S.C. § 355(j)(5)(B)(iv)(II)(2000) ....................................................... 37

21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb) ........................................................... 23

21 U.S.C. § 355(j)(5)(C) ............................................................................ 36

21 U.S.C. § 355(j)(5)(D)(i)(I) ..................................................................... 37

21 U.S.C. § 355(j)(5)(D)(i)(V) .................................................................... 38

21 U.S.C. § 355(j)(5)(F)(ii) ........................................................... 7, 11, 39, 42

21 U.S.C. § 355(j)(7)(a)(i) ........................................................................... 8

21 U.S.C. § 355(j)(7)(a)(ii) .......................................................................... 8

21 U.S.C. § 355(j)(7)(a)(iii) .......................................................................... 8

35 U.S.C. § 271(e) ......................................................................................... 9

**FDA Letter Rulings**

Letter from C. Parise to ANDA Applicants for Omeprazole
    Delayed-Release 40 mg (Sept. 2, 2005) ........................................... 28

Letter from G. Buehler to ANDA Applicants for Topiramate Sprinkle
    Capsules, ANDA Nos. 76-448 and 77-868 (Apr. 15, 2009) ................. 5, 24, 38

Letter from G. Buehler to D. Kerrish,
    ANDA No. 76-203 (Apr. 6, 2004) ..................................................... 28

Letter from G. Buehler to D. Servello, ANDA No. 75-347
    (Nov. 16, 2001) ................................................ 22, 23, 26, 27, 28, 35

Letter from G. Buehler to K. Beardsley and C. Shepard,
    ANDA No. 76-413 (June 1, 2004) ..................................................... 28

Letter from G. Buehler to M. Macdonald and J. Janulis,
    ANDA Nos. 75-350 and 75-360 (Jan. 28, 2003) .............................. 28

Letter from G. Buehler to M. Macdonald, ANDA No. 75-356
    (July 30, 2003) ....................................................... 22, 28, 35

Letter from G. Buehler to W. Whittingham,
    ANDA No. 75-766 (Feb. 6, 2003) ..................................................... 28

Letter from J. Woodcock to R. Green, S. Sklar and K. Beardsley,
    Dkt. No. 99P-1271/PSA1 & PSA2 (Aug. 2, 1999) .......................... 13

Letter from K. Webber to M. Goshko, ANDA No. 76-596
    (Mar. 28, 2012) ................................................ 17, 18, 31, 35, 39

Letter from K. Webber to W. Shultz, R. Dormer and K. Karst,
    ANDA No. 77-344 (Sept. 17, 2010) .............................. 13, 29, 30

**Other Authorities**

149 Cong. Rec. S15746 (Nov. 24, 2003) ...................................................... 37

FDA, Guidance for Industry: 180-Day Exclusivity When Multiple
    ANDAs Are Submitted on the Same Day
    (July 2003) .......................................................... 11, 41, 42

FDA, *Notice Of Proposed Rulemaking: 180-Day Generic
    Drug Exclusivity for Abbreviated New Drug Applications,*
    64 Fed. Reg. 42873 (Aug. 6, 1999) ............................................................ 21, 22

FDA, *Withdrawal of Proposed Rulemaking: 180-Day Generic
    Drug Exclusivity for Abbreviated New Drug Applications,*
    67 Fed. Reg. 66593 (Nov. 1, 2002) .................................................................. 22

H.R. Rep. No. 98-857, pt. 1, at 14, reprinted in
    1984 U.S.C.C.A.N. 2647, 2647 (1984) ............................................................. 6

MMA, Pub. L. 108-173, § 1102(b)(3) ..................................................... 11, 36

MMA, Pub. L. No. 108-173 § 1102(b)(1) ........................................... 5, 23, 38

MMA, Pub. L. No. 108-173, § 1102(b)(2) ...................................................... 38

## INTRODUCTION AND REQUEST FOR INTERIM RELIEF
## TO ENABLE MEANINGFUL JUDICIAL REVIEW

Teva Pharmaceuticals USA, Inc. ("Teva USA") is the ***only*** applicant for a generic version of Cephalon, Inc.'s ("Cephalon") PROVIGIL® tablets that challenged ***both*** of the patents Cephalon listed with FDA as claiming PROVIGIL® on the first dates that valid challenges to those patents could have been filed. Under well-settled law, that means that Teva USA ***alone*** is entitled to a 180-day period of marketing exclusivity during which the Hatch-Waxman Act prohibits FDA from approving any other applicant for a generic version of PROVIGIL®. Despite this well-settled law—and with just days remaining before the ***April 6*** deadline when FDA otherwise might begin to approve generic versions of PROVIGIL®—FDA not only has refused to confirm that Teva USA alone is entitled to exclusivity for this blockbuster drug, but instead has signaled its belief that Teva USA may not be entitled to such exclusivity.

FDA's actions with respect to exclusivity for this product threaten to impose significant, immediate, and irreparable harms on both Teva USA and Cephalon (both of which now are indirectly owned by Teva Pharmaceutical Industries Ltd. ("Teva Limited")). On one hand, Teva USA stands imminently to lose its statutory entitlement to marketing exclusivity, and it is well-established that the loss of that statutory right is an irreparable harm that warrants immediate injunctive relief. *See, e.g., Teva Pharm. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1311 (D.C. Cir. 2010) ("*Teva v. Sebelius*"); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998); *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (citing *Apotex,*

*Inc. v. FDA*, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006), *summarily aff'd*, 449

F.3d 1249 (D.C. Cir. 2006)).   On the other hand, Cephalon imminently stands to

face unlawful competition from the entry of generic competitors that federal law

precludes from competing against both PROVIGIL® and a so-called "authorized

generic" version of that product that Cephalon launched at the end of last week.

Such harms likewise are well-recognized by the courts.   *See, e.g., Teva v. Sebelius*,

595 F.3d at 1312 (citing *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1497

(D.C. Cir. 1996) (itself quoting *El Paso Natural Gas Co. v. FERC*, 50 F.3d 23, 27

(D.C. Cir. 1995))); *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 n.10 (4th Cir. 2000)

(citing *Mova*, 140 F.3d at 1074; *Schering Corp. v. FDA*, 51 F.3d 390, 395 (3d Cir.

1995)); *MD Pharm., Inc. v. DEA*, 133 F.3d 8, 11 (D.C. Cir. 1998).

Most important for present purposes, it will be impossible to remedy these

harms if this Court does not act ***now*** to prevent FDA from making the approval of

competing products effective on April 6.   Indeed, FDA's strategic decision to run out

the clock and then act before the courts meaningfully can address Teva USA's

entitlement to exclusivity does a disservice to everyone involved—as Judge Bates

forcefully recognized the last time FDA employed this tactic in a Hatch-Waxman

exclusivity case, and as Judge Howell explained just last week when FDA used this

same strategy to thwart effective judicial review of a similar regulatory decision.

*See Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1 (D.D.C. 2008) (Bates, J.); *see*

*also Astrazeneca Pharm. LP v. FDA*, 2012 WL 1037457, at *4 (D.D.C. Mar. 28, 2012)

(Howell, J.) ("The consequences of the FDA's tactics of 'hiding the ball' ... until

2

March 27, 2012 are two-fold: consideration of the merits of the legal issues presented by the plaintiff's complaint have been delayed, with the opportunity for judicial review of those issues last week lost and the expenditure of judicial resources of yet another Judge this week required."). In *Hi-Tech*, as here, FDA sought to frustrate judicial review by refusing timely to address generic exclusivity for a blockbuster drug called COSOPT®. As Judge Bates observed, FDA's actions harmed the market, the courts, and ultimately the public:

> FDA is creating … a situation where there really is no ability to challenge before what is alleged to be irreparable harm occurs. There's no real ability to challenge that exclusivity decision before … the floodgates of marketing open. Why does FDA think that's good? The players in the market don't think it's good…. The public doesn't think it's good, I don't think. You're not doing anything for the public. … The court certainly doesn't think it's good if I get a TRO application which they have preformulated at 3:30 and I have to decide … without me even reading your decision, I have to decide whether to enter a TRO just to hold the status quo, which of course is terrible for the public, because … it prevents any generic products from getting into the market.

*Hi-Tech* Hr'g Tr. at 9 (Oct. 2, 2008) (Exh. A). When FDA nonetheless refused to comply with the court's request to act in a timely manner, Judge Bates took steps to ensure an opportunity for meaningful judicial review—first scheduling a hearing for the date of the approval deadline, *Hi-Tech*, 587 F. Supp. 2d at 13, and then imposing a TRO that precluded FDA from approving competing products before the Court could consider an application for injunctive relief:

> [Y]ou're going to be enjoined not to [approve] any further [generic applications] until the Court allows it. ***I'm not going to try to make sense out of this idiotic process that the FDA [is using]. It is, from my perspective, insane what we're going through.*** I'm not going to try to ensure fairness to the parties who are in front of me and have the FDA go and issue an [approval] that allows some other

company to go out into the marketplace, and you need to understand that I'm not going to allow that.

*Hi-Tech* Hr'g Tr. at 9-11 (Oct. 28, 2008) (Exh. B) (emphasis added).

Despite the Department of Justice's representation to Judge Bates that it took his concerns seriously and would address them with the Agency[1]; despite the fact that the D.C. Circuit recently echoed those concerns[2]; and despite Judge Howell's rebuke of the Agency for "hiding the ball" ***just last week***, the courts' strongly voiced concerns about FDA's tactics continue to be ignored.  Plaintiffs thus have no choice but to seek immediate interim relief that will ensure an opportunity for meaningful judicial review before FDA can irreparably divest Teva of its

---

[1]   *Id.* at 21 (C. Frederick Beckner, III, Deputy Attorney General, Civil Division, U.S. Department of Justice: "I will go back and talk to FDA about what's happened here.  We'll see if there's a better way we can do things.  We'll talk about it.  We've heard the criticisms.")

[2]   *Teva v. Sebelius*, 595 F.3d at 1311 ("[T]he exclusivity reward that Congress made available as an incentive for patent challenges is time-sensitive, and where there is no material ambiguity about essential facts a court can readily decide whether it has been earned in advance of generic competition's onset.  The alternative approach—delaying review until the agency has made its technically tentative decisions final—puts a court in an awkward bind, unless it miraculously manages to resolve the merits issue more or less instantaneously.  Apart from that risky and improbable course, there would be two possible stopgaps available to preserve the first-mover advantage.  The court could delay *all* generic competition, thereby thwarting the statutory purpose of achieving swift competition by generics (a factor that would in turn weigh against preliminary injunctive relief under the 'public interest' component of the standard test).  Or it could delay the entrance of the exclusivity claimant's generic rivals into the market, thereby giving the claimant precisely the relief it seeks, simply in order to allow the court time to decide whether such relief was warranted.  The technical possibility that a judge might embrace one of these highly imperfect alternatives can hardly be thought to protect Teva from the hardship made likely by delayed review.") (emphasis in original).

4

statutory right to exclusivity and expose Cephalon to unlawful competition. Plaintiffs therefore request that the Court (1) enter a temporary restraining order preventing FDA from approving any Abbreviated New Drug Application ("ANDA") referencing PROVIGIL® other than Teva USA's ANDA until the Court resolves Plaintiffs' motion for preliminary injunctive relief; (2) schedule a hearing for the morning of April 6 to address Plaintiffs' motion for preliminary injunctive relief; (3) order FDA to produce its decision regarding 180-day exclusivity for ANDAs referencing PROVIGIL® at that hearing.

The remainder of this memorandum sets forth the undisputed facts giving rise to Teva USA's entitlement to sole exclusivity and the legal claims Plaintiffs intend to assert at the requested hearing in support their motion for injunctive relief.

## BACKGROUND

### A. The Hatch-Waxman Framework

As modified by the Drug Price Competition and Patent Restoration Act of 1984 (the "Hatch-Waxman Act"), the Food, Drug, and Cosmetic Act (the "FDCA") establishes the procedure for obtaining approval to market pharmaceutical products in the United States. *See* 21 U.S.C. § 355.[3]  To obtain approval for a brand-name

---

[3]  The FDCA has subsequently been amended by the Medicare Modernization Act of 2003 ("MMA"), and the Food and Drug Administration Amendments Act of 2007 ("FDAAA"), but those amendments have no bearing on this case.  *See* MMA, Pub. L. No. 108-173 § 1102(b)(1); *see also* Letter from G. Buehler to ANDA Applicants for Topiramate Sprinkle Capsules, ANDA Nos. 76-448 and 77-868, at 4 (Apr. 15, 2009) (Exh. C) ("Topiramate Letter Decision") (holding that the pre-
(Continued...)

drug like PROVIGIL®, the FDCA requires its manufacturer to prepare and submit a complete New Drug Application ("NDA") that contains, among other things, extensive scientific and clinical data demonstrating the safety and effectiveness of the proposed new drug. *See id.* § 355(b)(1). The NDA must also include information about each patent the applicant asserts as claiming that drug. *See id.* § 355(b)(2); *see also* 21 C.F.R. § 314.50(h); *id.* § 314.53(b).

Prior to Hatch-Waxman's passage, generic manufacturers generally were required to complete a full NDA in order to obtain approval for a proposed generic drug—even though generic drugs contain the same active ingredients, and provide the same therapeutic value, as their brand-name counterparts. As a result, generic market entry often was cost-prohibitive, and patients lacked widespread access to generic medicines that typically are sold at lower, more competitive prices to consumers, private insurers, and public insurers. In 1984, Congress enacted Hatch-Waxman to remove those barriers to entry, increase the availability of generic drugs, and thereby reduce the average cost of pharmaceuticals. *See, e.g., Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (citing, *inter alia*, H.R. Rep. No. 98-857, pt. 1, at 14 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647)).

---

MMA exclusivity provisions control when (as here) the first generic application (an "ANDA") was submitted prior to the MMA's effective date, even if subsequent ANDAs and Paragraph IV certifications are filed after the MMA's effective date). All citations to statutes and regulations are to the current versions, unless otherwise noted.

To accomplish those goals, Hatch-Waxman permits generic applicants to obtain approval so long as they can show that a proposed generic drug is bioequivalent to a "listed" (or previously approved) drug that FDA already has deemed safe and effective. Generic applicants do so by submitting an Abbreviated New Drug Application ("ANDA") that includes, among other things, studies showing the proposed generic drug's bioequivalence to the previously approved drug. 21 U.S.C. § 355(j). If FDA accepts the applicant's bioequivalence studies, the generic applicant need not repeat the safety and efficacy studies that were conducted on the brand-name drug. *Id.* § 355(j)(2)(A); *see also Mova*, 140 F.3d at 1063.

To balance the public's interest in generic market entry against the intellectual-property rights of NDA holders, Congress added two requirements to the Hatch-Waxman regime. First, it granted brand manufacturers a regulatory exclusivity period (commonly called "data exclusivity") which precludes a generic applicant from even submitting an ANDA referencing the branded product during the five-year period following FDA's initial approval of the referenced NDA (unless the ANDA challenges one of the brand manufacturer's patents, in which case the ANDA may be submitted after four years). 21 U.S.C. § 355(j)(5)(F)(ii). That provision ensures that a brand manufacturer who performs the extensive clinical work necessary to secure NDA approval will have an opportunity to recoup its investment regardless of whether or not its branded product is protected by patent.

Second, Congress recognized the importance of the brand manufacturer's patent rights, by requiring each ANDA to include a "certification" for every patent

7

the brand manufacturer has identified as claiming the referenced NDA product, including any patents that the brand manufacturer obtains after the initial NDA approval. *Id.* § 355(j)(2)(A)(vii); *see also Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1350-51 (Fed. Cir. 2003). To make this patent certification system work, the statute requires brand manufacturers to submit to FDA "the patent number and the expiration date of any patent which claims the[ir] drug … or … a method of using such drug," 21 U.S.C. § 355(b)(1), and obligates FDA to "publish," "make available to the public," and regularly "revise" a list of the patent information it receives, *id.* § 355(j)(7)(a)(i)-(iii). FDA does so in a compilation known colloquially as "the Orange Book." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004); *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 580 (D.C. Cir. 2001).

Because the Agency lacks patent-law expertise, it plays only a "ministerial role" in maintaining the Orange Book's patent listings. *See, e.g.*, *Apotex*, 347 F.3d at 1347, 1349-50; *see also* 21 C.F.R. § 314.53(f). As a result, generic applicants must submit "an appropriate certification for each listed patent," even if they disagree about "the correctness of the patent information … published by FDA in the list." 21 C.F.R. § 314.53(f); *see also Apotex*, 347 F.3d at 1350; *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 31 (D.D.C. 2006). Four such certifications are available:

> (I) that patent information has not been filed with respect to the referenced NDA [a "Paragraph I certification"],
>
> (II) that the patent identified as claiming the referenced NDA has expired [a "Paragraph II certification"],
>
> (III) that the generic drug will not be marketed until the date on which the patent identified as claiming the referenced NDA will expire [a "Paragraph III certification"], or

8

(IV) that the patent identified as claiming the referenced NDA is invalid or will not be infringed by the manufacture, use, or sale of the proposed generic drug [a "Paragraph IV certification"].

21 U.S.C. § 355(j)(2)(A)(vii).

Paragraph IV certifications play a critical role in the statutory scheme. Such certifications demonstrate the applicant's intent to challenge the brand manufacturer's patent monopoly, and thus create a possibility that generic competition might begin before the patent's scheduled expiration. *See, e.g., Teva Pharm. USA, Inc. v. Leavitt*, 548 F.3d 103, 106 (D.C. Cir. 2008) (*Teva v. Leavitt*) ("The legislative purpose underlying paragraph IV is to enhance competition by encouraging generic drug manufacturers to challenge the patent information provided by NDA holders in order to bring generic drugs to market earlier."). But filing a Paragraph IV certification carries significant risks. Paragraph IV challengers must invest significant resources to identify weaknesses in a competition-blocking patent and develop a non-infringing alternative or legal defense based on patent invalidity or unenforceability. If those efforts succeed and the applicant attempts to break the patent logjam by filing a Paragraph IV certification, the very act of submitting that certification is an "artificial" act of patent infringement that could require the applicant to spend years defending its actions in costly patent litigation. 35 U.S.C. § 271(e); *see also Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990). Indeed, if the brand manufacturer sues the applicant within 45 days of receiving notice of the applicant's Paragraph IV certification, FDA may not approve the applicant's ANDA for 30 months (while the patent case unfolds). 21 U.S.C. § 355(j)(5)(B)(iii). This time period is known as the

9

"30-month stay." *Eli Lilly & Co. v. Teva Pharm. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009).

To encourage generic manufacturers to undertake those investments and accept those risks, Hatch-Waxman typically offers a significant statutorily based "reward" to the first Paragraph IV challenger: a 180-day exclusivity period during which it is entitled to market its generic product without competition from subsequent ANDA applicants. *See, e.g., Teva v. Leavitt*, 548 F.3d at 104 ("Marketing exclusivity is valuable, designed to compensate manufacturers for research and development costs as well as the risk of litigation from patent holders."); *see also Purepac*, 354 F.3d at 879. This 180-day "exclusivity period" not only provides the first applicant with a window to sell its ANDA products without competition from other ANDA products, but enables that applicant to establish long-term distribution arrangements with wholesalers and retailers before its competitors enter the marketplace. For this reason, 180-day exclusivity can be worth hundreds of millions of dollars in cases involving drugs like PROVIGIL®, for which Cephalon's annual brand-name sales exceed $1 billion. *See* Declaration of Maureen Cavanaugh (the "Cavanaugh Decl.") at ¶ 5 (Exh. D). Under the version of Hatch-Waxman that applies here, that 180-day period begins to run on the earlier of (a) the date on which the first applicant first begins to sell its approved generic product (the "commercial marketing trigger"), or (b) the date of a court decision holding that the patent grounding the first applicant's exclusivity was invalid, not

infringed, or otherwise unenforceable ("the court decision trigger").[4]   21 U.S.C.

§ 355(j)(5)(B)(iv) (2002); *see also Apotex*, 2006 WL 1030151, at *1 n.1.

Finally, two complications relating to exclusivity arise frequently in practice, and FDA over time has established well-settled rules for resolving them.  The first complication involves situations where multiple companies submit ANDAs containing Paragraph IV certifications to a particular patent on the same day.  This commonly occurs as a result of the statute's data exclusivity provision, which as noted above prevents anyone from submitting an ANDA containing a Paragraph IV certification until four years after the referenced NDA product is approved.  *See* 21 U.S.C. § 355(j)(5)(F)(ii).   It is common in these circumstances for multiple Paragraph IV-containing ANDAs to be submitted on the day the data exclusivity period expires, and FDA's longstanding and consistently applied policy has been to deem each such applicant a "first applicant" that is entitled to "share" exclusivity based on their contemporaneously filed Paragraph IV certifications to a given patent.  *See* FDA, *Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day* (July 2003), at 5 ("FDA intends to treat all ANDAs containing a paragraph IV certification to a listed patent that are submitted on the same day as being submitted at the same time for purposes of 180-day

---

4   Typically, this would be a Federal Circuit decision holding that the exclusivity-grounding patent is invalid, not infringed, or unenforceable.   21 U.S.C. § 355(j)(5)(B)(iv) (2002); *see also* MMA § 1102(b)(3) (retroactively defining the term "decision of a court" as used in the pre-MMA statute to mean "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken").

exclusivity when no ANDA for the same drug product containing a paragraph IV certification to the same patent has been submitted on a previous day.") (Exh. E).

The second complication arises when a brand manufacturer has listed multiple patents for its NDA product, and different ANDAs contain the first Paragraph IV certification to the different patents listed by the NDA holder (*i.e.*, ANDA applicant A is the first company to challenge Patent 1, and ANDA applicant B is the first company to challenge Patent 2). This situation commonly occurs because (as noted above) NDA holders must update their Orange Book patent listings to account for new patents that have issued since the original NDA approval, and ANDA applicants must update their patent certifications to account for any newly listed patents. As a result, a *subsequent* challenger to the originally listed patent(s) sometimes become the *first* applicant to challenge a later-listed patent, and the *first* applicant(s) who challenged the originally listed patent(s) sometimes become *subsequent* challengers to the later-listed patent.

FDA long ago recognized that each challenged patent independently gives rise to exclusivity (that is, that exclusivity arises on a "patent-by-patent" basis), but that scenarios like the one described above could create mutually blocking exclusivities that preclude *any* generic applicant from being approved. In the above-noted example, for instance, applicant A's exclusivity for challenging Patent 1 would bar the approval of applicant B's ANDA for 180 days, while applicant B's exclusivity for challenging Patent 2 would block applicant A's approval for 180 days—so neither A nor B (or any subsequent applicant) could be approved. To avoid

such an exclusivity "standoff," FDA long ago held that applicants A and B are entitled "share" exclusivity as joint first challengers to the different patents, just as they would in a scenario where both applicants challenged the same patent on the same day. *See, e.g.*, Letter from J. Woodcock to R. Green, S. Sklar and K. Beardsley, Dkt. No. 99P-1271/PSA1 & PSA2 (Aug. 2, 1999) (Exh. F) ("Cisplatin Letter Decision"). However, FDA consistently and repeatedly has refused to apply "shared exclusivity" outside the standoff scenario—that is, in cases where there are not mutually blocking exclusivity periods that would prevent any ANDA product from being approved—on that ground that doing so is "inconsistent with the statutory language." Letter from K. Webber to W. Shultz, R. Dormer and K. Karst, ANDA No. 77-344, at 11 (Sept. 17, 2010) ("Donepezil Letter Decision") (Exh. G).

### B. Factual Background Relating To Modafinil Drug Products

Modafinil is the active ingredient in PROVIGIL®, a prescription medication used to improve wakefulness due to narcolepsy, obstructive sleep apnea, and shift work disorder. Cephalon holds NDA No. 20-717 for PROVIGIL®, which FDA approved on December 24, 1998. At the time FDA originally approved Cephalon's NDA for PROVIGIL®, Cephalon listed a single patent as claiming PROVIGIL® in the Orange Book: U.S. Patent No. RE37516 (the "'516 patent"), which was scheduled to block generic competition through April 6, 2015.

On December 24, 2002—exactly four years after Cephalon's PROVIGIL® NDA was approved—Teva USA submitted an ANDA seeking FDA approval to market a generic version of PROVIGIL® 100 mg and 200 mg tablets. Teva USA's ANDA contained a Paragraph IV certification to the '516 patent, claiming that the

patent is invalid, unenforceable, and/or would not be infringed by Teva USA's proposed generic drug. *See* Letter from W.P. Rickman to P. Erickson, ANDA No. 76-596 (Feb. 6, 2003) (Exh. H). FDA accepted Teva USA's generic PROVIGIL® ANDA for filing on that day, and docketed it as ANDA No. 76-596. *Id*. That same day, three other companies—Mylan Pharmaceuticals Inc. ("Mylan"), Ranbaxy Laboratories Ltd. ("Ranbaxy"), and Barr Laboratories, Inc. ("Barr")—also submitted ANDAs referencing PROVIGIL®, and their ANDAs likewise included Paragraph IV certifications to the '516 patent. Under the well-settled exclusivity principles discussed above, each of these four companies—Teva USA, Mylan, Ranbaxy, and Barr—is a co-first challenger to the '516 patent based on their same-day Paragraph IV certifications to that patent.

On November 20, 2007, Cephalon obtained a second patent related to PROVIGIL®: U.S. Patent No. 7,297,346 (the "'346 patent"), which was scheduled to block generic competition through May 29, 2024. On December 13, 2007, Cephalon submitted a Form 3542 asking FDA to list the '346 patent in the Orange Book, and the FDA received and date-stamped that form on December 14, 2007. *See* Letter from J. Ciciriello to R. Katz, ANDA No. 20-717 (Dec. 13, 2007) (Exh. I); Email from M.A. Holovac to R. Hrubiec & R. Zakreski, ANDA No. 20-717 (Jan. 24, 2008) ("The date stamp date … is 12/14/2007.") (Exh. J). Accordingly, the first date on which FDA could have received a valid Paragraph IV certification to the '346 patent was December 14, 2007. *See* 21 C.F.R. § 314.53(d)(5) ("Patent information shall be considered to be submitted to FDA as of the date the information is received by the

14

Central Document Room."); *see also Teva v. Leavitt*, 548 F.3d at 108 ("[B]oth the statute and the Agency's policies compel FDA to rely on the actual status of a patent (as indicated by the NDA holder) and … the Agency has consistently required ANDA applicants to certify to patents recently submitted to FDA.").

On that date, FDA received an amendment to Teva USA's ANDA that contained a Paragraph IV certification to the '346 patent. *See* Letter from P. Erickson to G. Buehler, ANDA No. 76-596 (Dec. 13, 2007) & Federal Express bill reflecting Dec. 14, 2007 delivery to FDA's Document Control Room (Exh. K). As with its Paragraph IV certification to the '516 patent, Teva USA's Paragraph IV certification to the '346 patent thus was received by FDA on the first date FDA could have received a valid Paragraph IV certification to the '346 patent. In stark contrast to their prompt challenges regarding the '516 patent, however, neither Mylan, nor Ranbaxy, nor Barr submitted a Paragraph IV certification to the '346 patent on December 14, 2007. Instead, only one other ANDA applicant did so: Carlsbad Technology, Inc. and its business partner Watson Pharmaceuticals, Inc. (together, "Watson").

While that makes Teva USA and Watson co-first challengers to the '346 patent, it also means that Teva USA itself is the ***only*** company that filed Paragraph IV certifications to ***both*** the '516 patent and the '346 patent on the first dates that Paragraph IV certifications to those patents lawfully could have been filed. That in turn means that there is no "standoff" regarding 180-day exclusivity: While Teva USA's first-to-challenge status on the '516 patent blocks the approval of Watson's

ANDA (which was a subsequent challenger on the '516 patent) and Teva USA's first-to-challenge status on the '346 patent blocks the approval the Mylan, Ranbaxy, and Barr ANDAs (which were subsequent challengers on the '346 patent), *no applicant's patent certifications block the approval of Teva USA's ANDA because Teva USA was the only first challenger to both listed patents for PROVIGIL®.* In short, Teva USA's status as the first applicant to submit a substantially complete ANDA for generic PROVIGIL® that contained Paragraph IV certifications to both Orange Book-listed PROVIGIL® patents entitles Teva USA *alone* to 180-day marketing exclusivity for generic versions of PROVIGIL® under well-settled law.

### C. Procedural Background

Although FDA had these facts in December 2007—after all, the Agency received the above-referenced Paragraph IV certifications from the various generic PROVIGIL® applicants—Teva USA itself was unaware of these facts until recently, after Teva Limited acquired Cephalon, and corporate affiliates Teva USA and Cephalon were able to share the relevant regulatory information.[5] On February 29,

---

5  The Federal Trade Commission ("FTC") extensively reviewed Teva Limited's acquisition of Cephalon and conditioned its approval of the transaction on, among other things, the entry of a supply agreement under which Cephalon would supply another company (Par Pharmaceutical, Inc., or "Par") with finished product for sale as an "authorized generic" version of PROVIGIL® and allow Par to enter the market with that product on April 6, 2012.  Teva Limited and Cephalon have complied fully with the terms of the FTC clearance and the Par supply agreement, and because Par's product will be marketed under Cephalon's NDA for PROVIGIL® (rather than an ANDA) the outcome of this litigation will have no impact on Par's ability to enter the market with its authorized generic

(Continued...)

16

2012, after Teva USA first learned that it was the only company that had filed Paragraph IV certifications to both the '516 patent and the '346 patent on the first dates that Paragraph IV certifications to those patents lawfully could have been filed, Teva USA informed FDA that it was aware of those facts and asked FDA to confirm that Teva USA alone was entitled to 180-day exclusivity for generic PROVIGIL®.  *See* Letter from M. Goshko to D. Read, ANDA No. 76-596 (Feb. 29, 2012) (Exh. L).

FDA responded on March 28, 2012.  Although the Agency acknowledged that Teva USA's understanding of the facts was accurate, Letter from K. Webber to M. Goshko, ANDA No. 76-596, at 3 (Mar. 28, 2012) (Exh. M) ("Webber Letter") ("Teva is in the unprecedented position of knowing specific information about all other ANDA applicants' patent certifications due to the fact that Teva's parent company acquired Cephalon and Cephalon's records concerning other ANDA applicants' paragraph IV certifications for modafinil."), it refused to address whether Teva USA alone is entitled to exclusivity for this blockbuster drug product.  *Id*.  Instead, it raised several unprecedented theories as to why Teva USA may not in fact be entitled to exclusivity despite Teva USA's undisputed status as the only ANDA applicant that filed Paragraph IV certifications to both listed patents on the first

---

version of PROVIGIL® on April 6.  For the same reasons, this litigation has no impact on Cephalon's ability to market its own authorized generic version of PROVIGIL® under the PROVIGIL® NDA, as Cephalon began doing last week. Accordingly, and regardless of the outcome here, two generic versions of PROVIGIL® will be on the market as of April 6.

dates that Paragraph IV certifications to those patents lawfully could have been filed. *Id.* at 1-2. Despite repeated efforts to resolve this matter without litigation, the Agency continues to refuse to confirm that Teva alone is entitled to exclusivity.

This action follows.

## LEGAL STANDARD

The legal standard governing preliminary injunctive relief is well-settled. To secure relief, the plaintiff must show that (1) there is a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury if the requested injunction is denied; (3) an injunction will not substantially injure the opposing party or other third parties; and (4) the public interest will be furthered by the issuance of the injunction. *See Mova*, 140 F.3d at 1066. For the reasons that follow, Plaintiffs readily meet all four prongs of this standard.

## ARGUMENT

**I.      Plaintiffs Are Likely To Succeed On The Merits.**

Teva USA and Cephalon are likely to succeed on the merits of their claim that Teva USA alone is entitled to exclusivity for generic PROVIGIL® tablets and that the statute thus bars FDA from approving any competing ANDA until Teva USA's exclusivity concludes. As set forth above, Teva USA is the *only* applicant that filed Paragraph IV certifications for both listed PROVIGIL® patents on the first date that Paragraph IV certifications to those patents lawfully could have been filed, and well-settled case law and consistently applied administrative precedent dictate that Teva USA *alone* thus is entitled to 180-day exclusivity.

18

**A. Teva Alone Is Entitled 180-Day Exclusivity Under The Statute's Well-Established "Patent-By-Patent" Exclusivity Regime.**

From Hatch-Waxman's outset, FDA consistently has recognized that the statute creates a "patent-by-patent" exclusivity regime under which each challenged patent gives rise to its own exclusivity right. More specifically, the operative version of the Hatch-Waxman Act creates 180-day exclusivity through the ANDA approval-timing provision set forth at 21 U.S.C. § 355(j)(5)(B)(iv) (2002) (emphasis added), which provides:

> If [an ANDA] contains *a certification described in subclause (IV) of paragraph (2)(A)(vii)* and is for a drug for which a previous [ANDA] has been submitted under this subsection *[containing] such a certification*, the [ANDA] shall be made effective not earlier than one hundred and eighty days after [the commercial marketing or court decision trigger], whichever is earlier.

In turn, the cross-referenced "subclause (IV) of paragraph (2)(A)(vii)" requires ANDA applicants to submit "a certification … with respect to *each patent* … that *such patent* is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." *Id.* § 355(j)(2)(A)(vii)(IV) (2002) (emphasis added); *see also Estate of Leder v. Comm'r of IRS*, 893 F.2d 237, 241 (10th Cir. 1989) (where one section of statute "specifically cross references" another, "Congress … meant to construe [the two] sections … *in pari materia*"); *State of Georgia v. Shalala*, 8 F.3d 1565, 1571-73 (11th Cir. 1994) (same).

As the cross-reference to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) makes clear and FDA's longstanding regulations confirm, 180-day exclusivity therefore is *patent-specific*—meaning that the first challenger to *each* listed patent can become eligible for 180-day exclusivity, rather than merely the first challenger to *any* listed

19

patent. That is so for two reasons. First, the "certification described in subclause (IV) of paragraph (2)(A)(vii)" which gives rise to 180-day exclusivity, *see* 21 U.S.C. § 355(j)(5)(B)(iv) (2002), is specific to a particular patent, *id.* § 355(j)(2)(A)(vii)(IV) (2002) ("*each patent*" … "*such patent*") (emphases added), and the subsequent ANDA whose approvability is subject to the exclusivity period therefore must contain a Paragraph IV certification to *the same* patent challenged by the previous ANDA's Paragraph IV certification, *id.* § 355(j)(5)(B)(iv) (the subsequent applicant's ANDA must contain "*such a certification*," which—to reiterate—necessarily is patent-specific) (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1) (providing for 180-day exclusivity where "an [ANDA] contains a certification that a relevant patent is invalid, unenforceable, or will not be infringed and the [ANDA] is for a generic copy of the same listed drug for which one or more substantially complete [ANDAs] were previously submitted containing a certification that *the same* patent was invalid, unenforceable, or would not be infringed") (emphasis added).

Second, the court-decision trigger for commencing the 180-day exclusivity period expressly references a final court decision invalidating or deeming non-infringed "*the patent* which is the subject of *the certification*" giving rise to exclusivity. *Id.* (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) (triggering 180-day exclusivity on "[t]he date of a decision of the court holding *the relevant patent* invalid, unenforceable, or not infringed.") (emphasis added). That language directly ties the 180-day exclusivity period to a particular patent challenge; a court decision regarding a different patent will not start the exclusivity clock, so the

20

exclusivity right necessarily is patent-specific. In the simplest possible terms: the exclusivity provision's repeated references and cross-references to "each patent," "such patent," and "the patent"—rather than "a patent," "any patent" or "all patents"—mean that exclusivity arises on a patent-by-patent basis, such that each challenged patent gives rise to its own exclusivity entitlement.

This understanding is neither new nor novel. As noted above, FDA's Hatch-Waxman regulations have implemented this approach since they first were promulgated in 1994, *see* 21 C.F.R. §§ 314.107(c)(1)-(2), and the Agency repeatedly has rejected alternate approaches. For instance, in 1999 an applicant for generic cisplatin filed a Citizen Petition asking FDA to adopt an alternate approach—known as "one first applicant" exclusivity—under which the first applicant to ***any*** listed patent would be solely entitled to exclusivity for generic versions of the NDA product, even if another ANDA applicant subsequently filed the first challenge to a different listed patent. *See* Cisplatin Letter Decision. FDA denied that petition, concluding the statute did not compel that approach and that the Agency's longstanding regulations foreclosed it. *Id.*

At the same time, however, FDA issued notice of a proposed rulemaking in which the Agency proposed to amend its regulations to adopt the one-first-applicant approach, based on concerns that the patent-by-patent approach can delay generic entry and is hard to administer where different ANDAs contain the first Paragraph IV certifications to different patents. FDA, *Notice Of Proposed Rulemaking: 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications*, 64 Fed. Reg.

21

42873, 42875-76 (Aug. 6, 1999) ("Although the statute would support granting multiple exclusivities, the agency has determined that such multiple exclusivities for a single drug could further delay the entry of generic drugs onto the market. For example, if two different applicants were eligible for exclusivity because each was the first to file a paragraph IV certification for a different listed patent, and neither exclusivity could begin to run until first commercial marketing or a favorable court decision, it is possible that each exclusivity would block the final approval of the other [ANDA] for a substantial period of time.").

The Agency received scores of comments in response, and the proposed departure from the patent-by-patent approach widely was panned. *See, e.g.*, Letter from G. Buehler to D. Servello, ANDA No. 75-347, at 2 (Nov. 16, 2001) (Exh. N) ("Omeprazole Letter Decision") (same) ("FDA received significant negative comment on this aspect of its proposal. Many of these comments questioned whether there is adequate statutory support for granting only one 180-day exclusivity period per drug product."). As a result, FDA declined to adopt the one-first-applicant approach and formally withdrew the proposed rule in 2002. FDA, *Withdrawal of Proposed Rulemaking: 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications*, 67 Fed. Reg. 66593 (Nov. 1, 2002).

Since that time (as it had before the rulemaking debacle), FDA consistently and repeatedly has adhered to the patent-by-patent approach mandated by the statute and its regulations. *See, e.g.*, Letter from G. Buehler to M. Macdonald, ANDA No. 75-356, at 2 (July 30, 2003) (Exh. O) ("Paroxetine Letter Decision") ("In

other words, the first applicant with a paragraph IV certification for each listed

patent [is] separately eligible for 180-day eligibility for exclusivity based on that

patent."); Omeprazole Letter Decision at 2 (same).  Accordingly, there is no basis for

departing from that approach here, and any attempt to do so would conflict with the

statute, FDA's longstanding regulations, and decades of consistent FDA practice—

as the D.C. Circuit recognized when it affirmed Judge Bates's "thoughtful opinion"

upholding FDA's pre-MMA patent-by-patent approach.  *See Apotex, Inc. v. FDA*, 226

Fed. App'x 4 (D.C. Cir. 2007), *aff'g* 414 F. Supp. 2d 61 (D.D.C. 2006); *see also Alaska

Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999) ("Once an

agency gives its regulation an interpretation, it can only change that interpretation

as it would formally modify the regulation itself: through the process of notice and

comment rulemaking.") (quoting *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117

F.3d 579, 586 (D.C. Cir. 1997)).[6]

---

[6]  It bears note here that the MMA no longer assigns exclusivity on a patent-by-patent basis.  Rather than *indirectly* creating exclusivity by blocking the approval of a subsequently filed ANDA that contain the same Paragraph IV certification as a previously filed ANDA, it *directly* confers exclusivity on any "applicant that, on the first day on which a substantially complete application containing a [Paragraph] certification described in paragraph (2)(A)(vii)(IV) is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a [Paragraph IV] certification."  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).  But Congress explicitly did not make that provision of the statute retroactive—which likewise forecloses any attempt to deviate from the Agency's pre-MMA patent-by-patent approach to exclusivity now.  *See* MMA, Pub. L. 108-173, § 1102(b)(1) ("Except as provided in paragraph (2), the amendment made by subsection (a) [amending 21 U.S.C. § 355] shall be effective *only* with respect to an application filed under [21 U.S.C. § 355(j)] after the date of the enactment of this Act [Dec. 8, 2003] for a listed drug for which no
(Continued...)

23

The upshot is straightforward: Each of the challenged PROVIGIL® patents independently gives rise to 180-day exclusivity—and because Teva USA was the *only* first Paragraph IV challenger to *both* listed patents, every other ANDA applicant is blocked by Teva USA's exclusivity with respect to each PROVIGIL® patent. On one hand, Teva USA's first-to-challenge status on the '516 patent (which it shares with Mylan, Ranbaxy, and Barr) blocks the approval of Watson's ANDA (Watson was a subsequent challenger on the '516 patent). Or, to use the statute's words, Watson's ANDA is blocked by 180-day exclusivity because it "contains a certification described in subclause (IV) of paragraph (2)(A)(vii)" (*i.e.*, a Paragraph IV certification to the '516 patent), "and is for a drug for which a previous [ANDA] has been submitted under this subsection [containing] such a certification" (*i.e.*, the previously filed Teva USA, Mylan, Ranbaxy, and Barr Paragraph IV certifications to the '516 patent). *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002).

On the other hand, Teva USA's first-to-challenge status on the '346 patent (which it shares with Watson) blocks the approval of the Mylan, Ranbaxy, and Barr ANDAs (which were subsequent challengers on the '346 patent). Again, to use the statute's words, those companies' ANDAs are blocked by 180-day exclusivity because they "contain[] a certification described in subclause (IV) of paragraph (2)(A)(vii)" (*i.e.*, a Paragraph IV certification to the '346 patent), "and [are] for a

---

[Paragraph IV] certification ... was made before the date of the enactment of this Act.") (emphasis added); *see also* Topiramate Letter Decision at 4 (Exh. C) (explaining that the pre-MMA statute controls exclusivity whenever, as here, the first ANDA was filed prior to the MMA's effective date).

drug for which a previous [ANDA] has been submitted under this subsection [containing] such a certification" (*i.e.*, the previously filed Teva USA and Watson Paragraph IV certifications to the '346 patent). *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002). ***But no applicant's patent certifications block the approval of Teva USA's ANDA, because Teva USA was*** *the only* ***first challenger to*** <u>***both***</u> ***listed patents for PROVIGIL®.*** In short, because Teva USA's ANDA is the only one that challenged both Orange Book-listed PROVIGIL® patents on the first dates that those patents could have been challenged, Teva USA *alone* is entitled to 180-day marketing exclusivity for generic versions of PROVIGIL® under the statute, FDA's regulations, and the Agency's longstanding, uninterrupted, and D.C. Circuit-sanctioned practice.

## B. There Is No Basis For Applying "Shared Exclusivity" Here.

As noted above, there are certain circumstances in which the Hatch-Waxman Act's "patent-by-patent" exclusivity regime requires multiple applicants to "share" exclusivity for a given drug product. Again, ANDA applicants must certify *both* to those patents listed in the Orange Book at the time they submit their initial ANDA *and* to those patents that the NDA holder subsequently lists in the Orange Book before the ANDA is approved. *Apotex*, 347 F.3d at 1350-51. That sometimes leads to cases in which different ANDA applicants are the first ones to challenge different listed patents, and in a narrow subset of those cases, the different companies' independent entitlements to exclusivity can create a "standoff" under which neither exclusivity-eligible applicant's ANDA can be approved. For instance, where ANDA applicant A is the first company to challenge Patent 1, and ANDA applicant B is the

first company to challenge Patent 2, applicant A's exclusivity for challenging Patent 1 would bar the approval of applicant B's ANDA for 180 days, while applicant B's exclusivity for challenging Patent 2 would block applicant A's approval for 180 days—so neither A nor B (or any subsequent applicant) could be approved.

FDA long ago broke that logjam by interpreting the statute to provide for "shared exclusivity" in the case of such mutually blocking exclusivities. But the Agency consistently has rejected efforts to apply shared exclusivity outside the standoff scenario. Accordingly, there is no basis for applying shared exclusivity here, and any departure from the Agency's consistent practice would be arbitrary and capricious.

FDA first applied its shared exclusivity policy in 2001, when it addressed 180-day exclusivity for generic versions of PRILOSEC® (omeprazole). *See* Omeprazole Letter Decision at 1. One company, Andrx, had filed the first Paragraph IV certification on seven patents, and another company, Genpharm, had filed the first Paragraph IV certification on three other patents. *Id.* As the Agency recognized at that time, the statute's patent-by-patent exclusivity regime thus created a standoff: Andrx's first-to-file Paragraph IV certifications would have blocked the approval of Genpharm's ANDA, while Genpharm's first-to-file Paragraph IV certifications would have blocked Andrx's approval. That led FDA to consider how to administer 180-day exclusivity in the case of what it deemed "multiple conflicting exclusivities"—*i.e.*, the standoff situation where different ANDAs earned exclusivity for having challenged different patents first, but where

26

those exclusivity rewards were mutually blocking and therefore prevented either ANDA applicant from enjoying its reward. *Id.*

In so doing, FDA determined that Congress had not anticipated the possibility of mutually blocking exclusivity periods and concluded that the statute did not explicitly address the "untenable" and "absurd result" created by offsetting exclusivities that prevented any first applicant from being approved. *See id.* at 2-3. It therefore "sought an approach to 180-day exclusivity that hew[ed] as closely as possible to the statutory language and [wa]s consistent with the goals of the legislation." *Id.* at 2. Its solution was "shared exclusivity," under which the applicants whose exclusivity periods otherwise would conflict instead would "share" the exclusivity period. *Id.* at 2-3. In the Agency's view, that interpretation of the statute was "consistent with the most natural reading of the statutory text, which refers to the paragraph IV certification for the patent [*i.e.*, the patent-by-patent exclusivity approach]," *id.* at 3, and best served the goals of the statute by maintaining the exclusivity incentive to challenge patents (which would be lost if no exclusivity-eligible applicant could obtain approval because of the standoff). Accordingly, FDA held that both Andrx and Genpharm would share exclusivity— meaning that both companies could enter the market simultaneously, with the 180-day period beginning to run upon the first commercial marketing of either generic product or a final court-decision trigger regarding any of the challenged patents. *Id.*

Since that time, FDA repeatedly and consistently has applied shared exclusivity in order to resolve such standoffs. *See, e.g.,* Letter from G. Buehler to K.

27

Beardsley and C. Shepard, ANDA No. 76-413 (June 1, 2004) (Exh. P) ("Metformin Letter Decision"); Letter from G. Buehler to D. Kerrish, ANDA No. 76-203 (Apr. 6, 2004) (Exh. Q) ("Ribavarin Letter Decision"); Paroxetine Letter Decision; Letter from G. Buehler to W. Whittingham, ANDA No. 75-766 (Feb. 6, 2003) (Exh. R) ("Calcitrol Letter Decision"); Letter from G. Buehler to M. Macdonald and J. Janulis, ANDA Nos. 75-350 and 75-360 (Jan. 28, 2003) (Exh. S) ("Gabapentin Letter Decision"). But FDA *always* has observed forcefully that it would be impermissible to apply shared exclusivity outside the narrow confines of the standoff scenario:

> When different applicants were first to submit effective paragraph IV certifications to different patents, the prospect arises of mutually blocking exclusivities and the application of the shared exclusivity approach (described, for example, in FDA's letters of November 16, 2001 (omeprazole); February 4, 2003 (calcitriol); July 30, 2003 (paroxetine); April 6, 2004 (ribavirin)). *[But] FDA does not believe it is appropriate to deviate from the patent-by-patent approach unless necessary to avoid mutually blocking exclusivity*.

Letter from C. Parise to ANDA Applicants for Omeprazole Delayed-Release 40 mg, at 4 (Sept. 2, 2005) (Exh. T) (emphasis added); *see also* Omeprazole Letter Decision at 2; Calcitriol Letter Decision at 3; Paroxetine Letter Decision at 2.

More recently, FDA addressed the limitations of shared exclusivity when it considered whether to apply that same approach for generic ARICEPT® (donepezil hydrochloride) tablets.  In that case, Ranbaxy alone submitted the first ANDA challenging four patents that brand manufacturer Eisai had listed in the Orange Book, and Teva USA subsequently filed an ANDA containing certifications to the same patents.  Teva USA subsequently amended its ANDA to include the first-filed Paragraph IV certification to a fifth patent, but Ranbaxy never amended its ANDA

to include a Paragraph IV challenge to that patent.  Donepezil Letter Decision at 2.

Accordingly, Ranbaxy's first-to-challenge status for the original four patents blocked

Teva USA's approval, but Teva USA's first-to-challenge status regarding the fifth

patent had no effect on the approvability of Ranbaxy's file: In the statute's words,

because Ranbaxy did not submit a subsequent Paragraph IV certification to the

fifth patent, its ANDA did not "contain[] a certification described in subclause (IV)

of paragraph (2)(A)(vii)" (*i.e.*, a Paragraph IV certification to the fifth patent), "for

which a previous [ANDA] has been submitted under this subsection [containing]

such a certification" (*i.e.*, a Paragraph IV certification to the fifth patent).  21 U.S.C.

§ 355(j)(5)(B)(iv) (2002).

Given the absence of an exclusivity standoff that would prevent ***both*** Teva

USA and Ranbaxy from being approved, FDA flatly refused to apply its shared

exclusivity policy despite Teva USA's request that it do so.   As the Agency

explained, applying shared exclusivity absent such a standoff

> does not have a basis in the statutory language. … Because shared
> exclusivity was created to avoid a situation where two or more
> applicants have filed paragraph IV certifications to multiple patents
> ***and have mutually blocking exclusivity***, it does not apply
> here because Ranbaxy filed a paragraph III certification to the '841 patent.
> Approval of Ranbaxy's ANDA is blocked by the '841 patent, ***rather
> than by Teva's exclusivity as to that patent, and it is
> inconsistent with the statutory language, as well as
> unnecessary, to extend shared exclusivity to the situation at
> hand.***

Donepezil Letter Decision at 11 (emphasis added) (Exh. G); *see also id.* at 3

("[B]ecause there was no mutually blocking exclusivity with respect to Teva's and

Ranbaxy's ANDAs, FDA's 'shared exclusivity' policy, which would permit approval

of the Teva ANDA, did not apply."). FDA thus held that Ranbaxy **alone** was entitled to exclusivity—despite the fact that, as here, different applicants had filed the first Paragraph IV certifications to different patents—because the approval of Ranbaxy's ANDA "is not blocked by any other ANDA's exclusivity." *Id.* at 12 n.18.

That ruling controls here. Again, because Teva USA is the **only** company that challenged **both** PROVIGIL® patents on the first date that any applicant lawfully could have done so, no other applicant's exclusivity blocks the approval of Teva USA's ANDA, but Teva USA's exclusivity blocks the approval of every other ANDA. Teva USA alone therefore is entitled to 180-day exclusivity, and it would be the height of arbitrary and capricious agency action for FDA to **reject** Teva USA's claim to shared exclusivity as "inconsistent with the statutory language" in one case—and indeed, to take the unprecedented step of using that determination to induce a federal district court to deprive Teva of relief in a pending patent litigation matter to which FDA was not a party, *see* Exh. U (cover letter from E. Blumberg to Hon. Garrett E. Brown re *Eisai Co. Ltd. v. Teva Pharms. USA, Inc.*, Case Nos. 05-5727, 07-5489 (D.N.J.)—but then turn around and **apply** shared exclusivity to Teva USA's detriment in this case. *See, e.g., Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an agency to treat like cases alike."); *Am. Fed. of State, County & Municipal Employees Area Council 26 v. FLRA*, 395 F.3d 443, 449 (D.C. Cir. 2005) (Roberts, J.) ("[R]easoned decision-making demands 'treating like cases alike.'") (quoting *Envtl. Action v. FERC*, 996 F.2d 401, 412 (D.C. Cir. 1993)); *Tax Analysts v. IRS*, 117

F.3d 607, 614 (D.C. Cir. 1997) ("If the Office of Chief Counsel renders an interpretation of a certain section in the tax code, whether in [a Field Service Advice] or elsewhere, that interpretation should apply to all other taxpayers who are, in material respects, similarly situated. Treating like cases alike is, we have said, 'the most basic principle of jurisprudence.'") (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (*en banc*)).

### C. The Issues FDA Has Raised Are Meritless.

FDA has not contested any aspect of the foregoing legal analysis, and it could not credibly do so given the Agency's uninterrupted application of that analysis throughout Hatch-Waxman's history. Instead, FDA now raises three smokescreens through which it seeks cover to deviate from its well-settled and consistently defended approach to exclusivity in these circumstances. None remotely justifies the Agency's apparent desire to depart from its settled practices.

> ### 1. FDA's Assertions Regarding The Relationship Between Teva USA and Cephalon Are Both Factually Incorrect And Legally Irrelevant.

FDA initially asserts that Teva USA may not be entitled to exclusivity because of "its unique posture with regards to modafinil as both the NDA holder and an ANDA applicant." Webber Letter at 2 (Exh. M); *see also id.* ("[O]ne of the ANDA applicants seeking exclusivity [*i.e.*, Teva USA]—which would block approval of other ANDAs—is also the NDA holder."). That assertion is both demonstrably false and legally irrelevant.

It is demonstrably false because Teva USA assuredly is not "both the NDA holder and an ANDA applicant." *Id.* While there is no question that Teva USA's

31

parent company, Teva Limited, purchased Cephalon in October 2011, there also is no question that Cephalon [A] remains a distinct corporate entity from both Teva Limited and Teva USA and [B] continues to hold the approved NDA for PROVIGIL®. There likewise is no question that Teva USA [A] remains a distinct corporate entity from both Teva Limited and Cephalon and [B] continues to hold the ANDA entitled to sole exclusivity for generic versions of PROVIGIL®. Without belaboring the point, the U.S. Supreme Court repeatedly has affirmed the sanctity of the corporate form—including in the context of relationships between parent corporations and their subsidiaries—and there is no basis in law or logic for the Agency's dangerous attempt to undermine the corporate form by conflating these distinct entities in order to divest Teva USA's statutory right to exclusivity. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."); *id.* at 475; *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citing, *inter alia, Burnet v. Clark*, 287 U.S. 410, 415 (1932) ("A corporation and its stockholders are generally to be treated as separate entities")); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 625 (1983) ("Separate legal personality has been described as an almost indispensable aspect of the public corporation.") (quotation marks omitted).

FDA's failure to recognize this fundamental corporate law principle is no surprise: The Agency's sudden interest in corporate relationships would be legally irrelevant even if FDA had its facts right. FDA is not charged with monitoring such

relationships, and nothing in the Hatch-Waxman conditions eligibility for 180-day exclusivity on whether the first patent challenging ANDA applicant is or is not related to another corporate entity.  The statute simply does not provide that:

> If [an ANDA] contains a [Paragraph IV certification] and is for a drug for which a previous [Paragraph IV certification] has been submitted..., the [ANDA] shall be made effective not earlier than one hundred and eighty days after [the commercial marketing or court decision triggers], whichever is earlier—***unless the applicant who submitted the previous Paragraph IV certification is related to the holder of the NDA referenced in the applicant's ANDA***.

> or

> If [an ANDA] contains a [Paragraph IV certification] and is for a drug for which a previous [Paragraph IV certification] has been submitted ***by a person who is not related to the holder of the NDA referenced in the ANDA***, the [ANDA] shall be made effective not earlier than one hundred and eighty days after [the commercial marketing or court decision triggers], whichever is earlier.

Instead, the statute and FDA regulations merely require that the exclusivity-eligible applicant submit the first Paragraph IV certifications challenging the brand manufacturer's Orange Book listed patents.  21 U.S.C. § 355(j)(5)(B)(iv) (2002); *see also* 21 C.F.R. § 314.107(c).  Teva USA satisfies the ***only*** statutory and regulatory criteria for exclusivity; it should not be punished because its parent company acquired Cephalon years after Teva USA earned its right to sole 180-day exclusivity for generic PROVIGIL®; and FDA has no business rewriting the law on an *ad hoc* basis to achieve its desired policy aims.

Indeed, FDA's impermissible interest in rewriting the statute here is part-and-parcel of the Agency's longstanding—and repeatedly rejected—campaign to constrict 180-day exclusivity by imposing additional requirements that have no

basis in the law's text. *See, e.g., Mova*, 140 F.3d at 1069 (rejecting as "gravely inconsistent with the text and structure of the statute" FDA's attempt to condition exclusivity on the first applicant prevailing in patent infringement litigation arising from a Paragraph IV certification (the "successful defense requirement")); *Granutec, Inc. v. Shalala*, 1998 WL 153410, at *7 (4th Cir. Apr. 3, 1998) (rejecting FDA's successful defense requirement on the ground that it "adds a requirement to 21 U.S.C. § 355(j)(4)(B)(iv) that Congress never contemplated" and was "an invalid addition to the statutory requirements for exclusivity"); *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 125 (D.C. Cir. 2006) (rejecting FDA's effort to reprise the successful defense requirement by allowing brand manufacturers to divest first applicants of exclusivity unless litigation had resulted from a Paragraph IV certification: "Not only does the statute not require litigation to preserve a generic applicant's eligibility for exclusivity, as those precedents make clear; such a requirement is inconsistent with the structure of the statute.").

Put simply, no court has ever sanctioned FDA's repeated efforts to add such limitations to the Hatch-Waxman Act, and there is no basis for doing so here.[7] FDA's refusal to recognize Teva USA's right to 180 days of sole exclusivity for generic modafinil tablets is contrary to the facts; contrary to longstanding principles

---

[7]   Indeed, FDA has never previously expressed any concern in any context over corporate relationships like the ones at issue here. That is not for lack of opportunity: The pharmaceutical industry is incredibly dynamic, and newly affiliated corporate entities commonly hold applications (or approvals) to market the same drug. Moreover, many branded companies have generic divisions or own generic subsidiaries.

of corporate law; contrary to the text of the statute and FDA's implementing regulations; and unsupported by the Agency's past practice.

> **2.  FDA's Assertions Regarding The Status Of Teva USA's ANDA Are Both Factually Incorrect And Legally Irrelevant.**

FDA next asserts that Teva USA may not be entitled to exclusivity because "(1) Teva has not filed a submission to its ANDA for modafinil tablets since 2009, (2) it has not requested final approval of its ANDA, and (3) it has not provided FDA with any indication that, in light of its purchase of the RLD, it ever intends to seek approval of its ANDA." Webber Letter at 2 (Exh. M). Yet again, FDA's claims are both factually incorrect and legally irrelevant.

These claims are factually incorrect because Teva USA recently asked FDA to grant its ANDA final approval. Cavanaugh Decl. ¶ 17 (Exh. D). And even if FDA were correct about the facts, none of these considerations have any legal bearing on whether or not Teva USA is entitled to 180 days of marketing exclusivity under the operative version of Hatch-Waxman. Again, the statute and regulations merely require the exclusivity-eligible applicant to submit the first Paragraph IV certifications challenging the brand manufacturer's Orange Book listed patents. 21 U.S.C. § 355(j)(5)(B)(iv) (2002); *see also* 21 C.F.R. § 314.107(c); Paroxetine Letter Decision at 2 ("In other words, the first applicant with a paragraph IV certification for each listed patent [i]s separately eligible for 180-day eligibility for exclusivity based on that patent.") (Exh. O); Omeprazole Letter Decision at 2 (same) (Exh. N). Neither the statute, the regulations, nor any past practice of the Agency require the exclusivity-entitled applicant to continuously file submissions to its ANDA; request

final approval for its ANDA by a certain deadline; or otherwise "indicat[e]" to FDA that it intends to enter the market at the earliest possible opportunity. Put differently, the factors FDA now claims it "must consider" simply aren't part of the pre-MMA statutory regime and have no relevance under any legal precedent.

Instead, FDA's real concern appears to be that Teva USA may not immediately begin marketing its ANDA product and, thus, that Teva USA may not immediately trigger the exclusivity period to which it unambiguously is entitled under the statute, regulations, and decades of settled FDA precedent. That concern is misplaced for two reasons. *First*, commercial marketing is not the exclusive means by which the first applicant's exclusivity period can be triggered. Instead, the statute also provides that the 180-day period will begin to run on the entry of a Federal Circuit decision holding that the exclusivity-grounding patent is invalid, not infringed, or unenforceable. 21 U.S.C. § 355(j)(5)(B)(iv) (2002); *see also* MMA § 1102(b)(3) (retroactively defining the term "decision of a court" as used in the pre-MMA statute to mean "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken"). To that end, the statute provides that Paragraph IV applicants can seek a declaratory judgment that a challenged patent is invalid, not infringed, or otherwise unenforceable, 21 U.S.C. § 355(j)(5)(C), and the Federal Circuit in turn has held that subsequent Paragraph IV filers have Article III standing to pursue such claims precisely because a successful declaratory judgment action can trigger the first-filer's exclusivity. *See, e.g., Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.,* 527 F.3d

1278, 1293 (Fed. Cir. 2008) ("A favorable judgment in this case would clear the path to FDA approval that Forest's actions would otherwise deny Caraco—namely, using the court-judgment trigger of 21 U.S.C. § 355(j)(5)(B)(iv)(II) (2000) to activate Ivax's exclusivity period.").[8]

*Second*, and in any event, the possibility that a first applicant's exclusivity period will not begin to run immediately is neither novel nor unprecedented; it is a well-known part of the pre-MMA statute. Indeed, this very feature of the original statute is why Congress added a series of so-called exclusivity "forfeiture triggers" when it passed the MMA. *See Hi-Tech*, 587 F. Supp. 2d at 20 (explaining that the new forfeiture triggers were intended "'to ensure that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition'") (quoting 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer)). Thus, the MMA now provides that the first applicant's exclusivity can be "forfeited" if the first generic applicant fails to begin marketing its ANDA product within certain deadlines. *See* 21 U.S.C. § 355(j)(5)(D)(i)(I); *see also Teva v. Sebelius*, 595 F.3d at 1306-07 (describing the

---

[8]   Indeed, subsequent ANDA filer Apotex, Inc. is pursuing precisely such a claim right now, and the federal district court adjudicating Apotex Inc.'s ("Apotex") ongoing challenge to Cephalon's '516 patent recently held that Apotex's modafinil ANDA would not infringe the '516 patent. *See Apotex, Inc. v. Cephalon, Inc.*, No. 2:06-cv-2768 (E.D. Pa. Mar. 28, 2012). If that decision is affirmed on appeal and Teva USA has not yet commenced commercial marketing of its exclusivity-entitled modafinil ANDA product under its ANDA by that point in time, entry of the Federal Circuit's mandate would trigger Teva USA's exclusivity period under the court-decision trigger.

operation of the "failure-to-market" forfeiture trigger).   But Congress expressly declined to make these provisions of the statute retroactive:

> Except as provided in paragraph (2), the amendment made by subsection (a) [amending 21 U.S.C. § 355] shall be effective *only* with respect to an application filed under [21 U.S.C. § 355(j)] after the date of the enactment of this Act [Dec. 8, 2003] for a listed drug for which no [Paragraph IV] certification … was made before the date of the enactment of this Act.

Pub. L. 108-173, § 1102(b)(1) (emphasis added); *see also* Topiramate Letter Decision at 4 (explaining that the pre-MMA exclusivity provisions control whenever the first ANDA was filed prior to the effective date of the MMA).[9]

There is thus no basis for FDA's asserted need to "consider" whether the Agency's (erroneous) claims about the status of Teva USA's ANDA have any bearing on Teva USA's entitlement to sole exclusivity.   The concept of forfeiture is foreign to the pre-MMA statute, and given Congress's explicit refusal to make the relevant forfeiture triggers retroactive, there is no basis for adopting an approach that effectively would make them so.   *See Vartelas v. Holder*, ___ S. Ct. ___, 2012 WL 1019971, at *6 (Mar. 28, 2012) ("The presumption against retroactive legislation …

---

[9]   The cross-referenced exception under § 1102(b)(2) grants retroactive effect to the new forfeiture trigger codified at 21 U.S.C. § 355(j)(5)(D)(i)(V), which (generally speaking) provides for forfeiture in the event that the first applicant enters into an unlawful agreement with the NDA holder; a complaint is filed by the FTC or Attorney General; and "there is a final decision of the [FTC] or the court with regard to the complaint from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the agreement has violated the antitrust laws."   There is no such an agreement here; no such complaint has been filed by the FTC or Attorney General; and, needless to say, there has been no such final decision.

'embodies a legal doctrine centuries older than our Republic.'") (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 263, 265 (1994)).

### 3.   FDA Long Ago Rejected Mylan's Claims Regarding Exclusivity For The '516 Patent.

Finally, FDA's March 28 letter regarding exclusivity for generic PROVIGIL® references an argument Mylan made seven years ago regarding exclusivity for the '516 patent.   Webber Letter at 2 ("We also note that Mylan, another ANDA applicant for modafinil, has claimed it is a first applicant eligible for exclusivity as to U.S. Patent No. RE37516 (the '516 patent) on a legal theory that is different from the one set out in your letter.") (Exh. M).  In contrast to the other smokescreens to which FDA's letter alludes, the Agency does not even pretend that it is taking Mylan's argument seriously.  And for good reason: FDA long ago rejected Mylan's fatuous claim that it alone filed the first Paragraph IV certification to the '516 patent.

The basic facts are as follows.  As noted above, Teva USA, Mylan, Ranbaxy, and Barr all filed ANDAs that included Paragraph IV certifications to the '516 patent on December 24, 2002—the day that Cephalon's data exclusivity period expired under 21 U.S.C. § 355(j)(5)(F)(ii), and therefore the first day that any Paragraph IV certification to the '516 patent could have been filed.  Even though each of the ANDAs was filed on the same day, Mylan claims that its agent muscled his way to the front of the line when FDA's offices opened at 7:00 A.M. and thereby managed to get Mylan's ANDA stamped by FDA's file clerk moments before the clerk stamped the ANDAs submitted by Teva USA, Ranbaxy, and Barr.  Mylan

therefore has asserted that only its ANDA is a "previous application" entitled to exclusivity (and that all other applicants are subsequent challengers to the '516 patent) because Mylan's agent beat the other applicants to FDA's file clerk by a few moments.

FDA consistently has declined to apply Mylan's ticking-clock, race-to-the-desk-of-the-FDA-file-clerk approach—including in the scores of cases in which FDA has determined that two applicants share exclusivity based on same-day Paragraph IV certifications to the same patents.   Instead, the Agency repeatedly has interpreted the statute to provide that where multiple applicants submit ANDAs with Paragraph IV certifications to the same patent on the same day, each is considered a first applicant to that patent.   For their part, FDA's longstanding regulations (first promulgated in 1994) explicitly provide that there can be multiple "previous applications" entitled to exclusivity based on the same-day approach.   *See* 21 C.F.R. § 314.107(c)(1) (providing that 180-day exclusivity blocks a subsequent ANDA that "contains a certification that a relevant patent is invalid, unenforceable, or will not be infringed and … is for a generic copy of the same listed drug for which ***one or more substantially complete abbreviated new drug applications were previously submitted*** containing a certification that the same patent was invalid, unenforceable, or would not be infringed") (emphasis added).

Moreover, the Agency long ago explained that the second-by-second approach does not make the first-stamped ANDA "previous" to any other applicant's ANDA in any meaningful sense of that term: "There is no public health reason to encourage

and reward competition over being the first to submit a paragraph IV certification within minutes or seconds of another such applicant." FDA, *Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day* at 5 (July 2003) (Exh. E). That is so because filing a Paragraph IV certification moments before another applicant does nothing to advance the onset of generic competition. FDA does not (and cannot) begin reviewing the first-stamped ANDA during the few seconds that pass before the next ANDA is stamped, so the applicant who manages to get his or her ANDA stamped a few seconds before the next applicant has not done anything to expedite generic market entry. Indeed, FDA long ago found that Mylan's approach actually was having adverse impacts on the public's health and safety. As the Agency explained, Mylan's tenacity (and concern among other applicants over the long-shot possibility that FDA might one day reward Mylan's approach) was creating a public health menace:

> Recently, there have been a number of cases in which multiple ANDA applicants or their representatives have sought to be the first to submit a patent challenge by lining up outside, and literally camping out adjacent to, an FDA building for periods ranging from 1 day to more than 3 weeks. Concerns about liability, security, and safety led the property owners to prohibit lines of applicants before the date submissions may be made…. [Adopting the same-day approach is necessary to] preserve the safety and security of the applicants and FDA property and staff.

*Id.* at 4.

Finally, FDA noted that the same-day approach had an array of advantages over the second-by-second approach. For submissions by mail, awarding exclusivity based on the order in which a given ANDA was stamped by the file clerk entailed "the random aspect of a lottery," because there could be no guarantee that a

41

Paragraph IV certification sent by mail actually was the first Paragraph IV ANDA to arrive at FDA; it more likely was the first one the mail room opened. *See id.* As a practical matter, that meant that no applicant could ever file its "submission by U.S. mail or courier or delivery service" if it wished to enjoy exclusivity. *Id.* And indeed, even for in-person filings, it was not always clear whose ANDA was stamped by the file clerk first: In some cases, FDA was being asked to assess whose ANDA first was stamped by the file clerk based on "video and other evidence." *Id.*

In a word, Mylan's claim to sole exclusivity on the '516 patent is silly—which is why FDA's March 29 letter does not even pretend that it is seriously considering jettisoning the same-day approach that it has followed in every prior Hatch-Waxman exclusivity case. At the end of the day, there simply is no basis under the statute, the Agency's regulations, nearly a dozen prior Letter Decisions, or FDA's consistent practice over decades for depriving Teva USA of its sole right to exclusivity for generic PROVIGIL® tablets, and plaintiffs thus have an overwhelming likelihood of success on the merits of their claims.[10]

---

[10] Of course, even if Mylan were correct that the hour and minute at which an ANDA application is submitted controls for exclusivity purposes (which it is not), the obvious flip-side of that proposition is that the hour and minute at which Cephalon's NDA was approved also would be relevant: Otherwise, NDA holders like Cephalon might be deprived of the full four-year data exclusivity provision to which they are entitled under 21 U.S.C. § 355(j)(5)(F)(ii). For purposes of determining whether an ANDA was prematurely submitted or timely filed, FDA thus would have to devote resources to tracking NDA approvals to the minute and then determining the timeliness of ANDA submissions with the precision of a Swiss watch. The absurdity of this result speaks for itself.

## II.     Plaintiffs Will Suffer Irreparable Harm Absent The Entry Of Immediate Injunctive Relief.

Both Teva USA and Cephalon will be irreparably harmed unless this Court promptly enjoins defendants from approving ANDAs other than Teva USA's ANDA on April 6.  On the Teva USA side, numerous courts have recognized that it is impossible for the first patent-challenging ANDA applicant to obtain effective judicial relief after FDA approves competing ANDA products for commercial sale. *See, e.g., Teva v. Sebelius*, 595 F.3d at 1311 (explaining that "the exclusivity reward that Congress made available as an incentive for patent challenges is time-sensitive" and that "'the loss of [a generic's] officially sanctioned head start' [is] an injury that would not be remedied by [its] securing 180 days of exclusivity later on") (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998) (first alteration in original)); *Sandoz*, 439 F. Supp. 2d at 32 ("'Once the statutory entitlement has been lost, it cannot be recaptured.'") (quoting *Apotex*, 2006 WL 1030151, at *17, *summarily aff'd*, 449 F.3d 1249 (D.C. Cir. 2006)); *see also Hi-Tech* Hr'g Tr., Oct. 2, 2008, at 9 ("FDA is creating ... a situation where there really is no ability to challenge before what is alleged to be irreparable harm occurs.") (Exh. A).

That is so for three reasons.  First, 180-day exclusivity is an extraordinarily valuable statutory right.  By definition, it allows the first Paragraph IV challenger to exclude its Paragraph IV competitors from the market during the first six months after it enters the market, and thereby establishes a statutorily protected window during which the first patent challenger alone is entitled to establish its market position for ANDA versions of the branded product.  If ANDA competitors enter,

43

however, the statutory right effectively evaporates: The first applicant not only stands to lose a significant percentage of its ANDA sales to those competitors when it begins marketing its product—even though Congress gave the first applicant a statutory right to *all* ANDA sales during the first six months after it enters the market—but must compete against those applicants on price to secure its share of the multi-way market.  Cavanaugh Decl. ¶¶ 18-19 (Exh. D).  Those harms can be especially significant in cases like this one, where more than 60 million PROVIGIL® tablets were dispensed to consumers in 2011 and Cephalon's annual U.S. sales of the product exceeded $1.1 billion. *Id.* ¶ 5.

Second, exclusivity typically has benefits that extend beyond the initial six-month period.  "180-day exclusivity typically gives the first ANDA entrant a permanent advantage over subsequent ANDA entrants, because that officially sanctioned "head start" permits first entrants to secure distribution channels and access to customers; enter into long-term sales agreements; strengthen relationships that enhance sales across all of its product lines; and retain greater market share in the long-run." *Id.* ¶ 23; *see also Teva Pharm. USA, Inc. v. Sebelius*, 638 F. Supp. 2d 42, 53 (D.D.C. 2009), *rev'd on other grounds*, 595 F.3d at 1303 (explaining the long-term benefits of 180-day exclusivity to the first applicant); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) ("Plaintiffs will face a second form of imminent harm when the FDA acts on MBI's application later today—assuming it is approved…. [T]here is a significant economic advantage to receiving first approval and being the first company to enter the market, an

advantage that can never be fully recouped through money damages or by 'playing catch-up.'").

Finally, these harms are truly irreparable.   On one hand, "[o]nce a consumer's prescription is filled with a competitor's product, it will be impossible to 'make up' for that lost sale by filling his or her *next* prescription; each tablet is consumed only once."   Cavanaugh Decl. ¶ 24 (emphasis in original).   On the other hand, the government's sovereign immunity would preclude Teva USA from recovering monetary damages from defendants in the event this Court later overturns the FDA's ruling.   *See, e.g., Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004) (injunctive relief warranted because "plaintiff will be unable to sue to recover any monetary damages against either Freddie Mac or OFHEO"); *Bracco Diagnostics*, 963 F. Supp. at 28 (FDA's immunity from damages means that "there is no adequate compensatory or other corrective relief that can be provided at a later date") (internal quotation marks omitted); *see also Entergy Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000); *cf. CSX Transp., Inc. v. Williams*, 406 F.3d 667, 674 n.7 (D.C. Cir. 2005).

The same is true on Cephalon's side of the ledger.   On April 6, only two competitors lawfully could begin competing with Cephalon: Teva USA (assuming the approval of Teva's ANDA) and Par, whose authorized generic version of the product lawfully can compete against both PROVIGIL® and Cephalon's own authorized generic version of the product because it will be marketed under Cephalon's own NDA for PROVIGIL®.   *See supra* at n.5.   But FDA's unlawful

45

approval of additional ANDA competitors will impose immediate and irreparable harms on Cephalon—by immediately depriving Cephalon of sales for its authorized generic version of PROVIGIL®, *see* Declaration of Michael Derkacz ¶ 17 (Exh. V), and subjecting Cephalon's authorized generic product to additional price competition. *Id.* Cephalon's losses from the entry of additional ANDA products, which are projected to exceed $60 million dollars per quarter, *see id.*, unquestionably are cognizable. *See, e.g., Teva v. Sebelius*, 595 F.3d at 1312 (noting that "the impending prospect of allegedly unlawful competition" is "the same harm that has sufficed for Article-III injury purposes in all of our past drug-approval cases") (citing *Bristol-Myers Squibb*, 91 F.3d at 1497 ("[U]nder what we have termed the 'competitor standing doctrine ... when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause a petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing."") (itself quoting *El Paso Natural Gas*, 50 F.3d at 27)); *Zeneca*, 213 F.3d at 170 n.10 ("'[N]umerous cases have found that a firm has constitutional standing to challenge a competitor's entry into its market.'") (quoting *Mova*, 140 F.3d at 1074; citing *Schering*, 51 F.3d at 395; *MD Pharm.*, 133 F.3d at 11).

And, as with Teva USA's injuries, these harms likewise are irreparable. In contrast to patent-infringement cases—where it may be possible for an NDA holder to recoup damages from an ANDA applicant who begins marketing its ANDA product "at risk" and later is found to have infringed the NDA holder's patent rights—it bears repeating that the defendants in this case enjoy sovereign

46

immunity from monetary damages, meaning that it will be impossible for Cephalon
to recover monetary damages from the lost sales it stands to face in the event that
FDA approves any ANDA product other than Teva USA's until the conclusion of
Teva USA's statutory period of marketing exclusivity. *Brendsel*, 339 F. Supp. 2d at
66; *Bracco Diagnostics*, 963 F. Supp. at 28; *see also Entergy*, 210 F.3d at 899; *cf.*
*CSX Transp.*, 406 F.3d at 674 n.7.

### III.   The Balance Of Hardships And Public Interest Favor The Entry Of Immediate Injunctive Relief.

The final equitable factors—the balance of hardships and public interest—
likewise favor granting immediate injunctive relief.  With respect to the former,
defendants cannot seriously claim that they would be harmed by an injunction
requiring them to apply Hatch-Waxman in a manner that comports with Congress's
intent, the Agency's regulations, and FDA's own well-established practice.  And
while other ANDA applicants who seek to market will for now be unable to market
their products as a result of Teva USA's sole entitlement to exclusivity, any harm to
those companies vastly would be outweighed by the harm Teva USA and Cephalon
would suffer absent injunctive relief.  After all, Teva USA claims the ***exclusive***
statutory right to market its ANDA product, while its competitors seek only the
right to be one of many companies that would do so.  From Teva USA's perspective,
that means the costs of denying injunctive relief will be borne singularly by Teva
USA, while any costs to the subsequent applicants from the entry of an injunction
would be shared across the generic industry—and, from Cephalon's perspective,

offset by the losses Cephalon would suffer from being exposed to such unlawful competition.

Finally, it is the public that stands to lose the most if this Court declines to enjoin FDA from divesting Teva USA of its right to 180-day marketing exclusivity. *The entry of authorized generic products by both Cephalon and Par ensures that consumers will have immediate access to less expensive generic versions of PROVIGIL® regardless of the outcome of this litigation.* But if the courts do not act to protect 180-day exclusivity when FDA threatens to take it away, generic companies will be less likely to challenge patents by filing Paragraph IV certifications in the future—slowing the onset of generic competition, and ultimately increasing prices for patients and insurers. As the D.C. Circuit forcefully explained last time FDA sought to undermine the exclusivity incentive:

> The statute's grant of a 180-day delay in multiple generic competition for the first successful paragraph IV filer is a pro-consumer device. And it happens to be precisely the device Congress has chosen to induce challenges to patents claimed to support brand drugs. The statute thus deliberately sacrifices the benefits of full generic competition at the first chance allowed by the brand manufacturer's patents, in favor of the benefits of earlier generic competition, brought about by the promise of a reward for generics that stick out their necks (at the potential cost of a patent infringement suit) by claiming that patent law does not extend the brand maker's monopoly as long as the brand maker has asserted. As Congress deliberately created the 180-day exclusivity bonus, the FDA cannot justify its interpretation by proudly proclaiming that it has eviscerated that bonus.

*Teva v. Sebelius*, 595 F.3d at 1318. In short, the public interest favors prompt action to preserve the integrity of the Hatch-Waxman regime.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction.

Dated: April 3, 2012                     Respectfully submitted,

                                         By: Michael D. Shumsky
                                         Jay P. Lefkowitz, P.C. (449280)
                                         Michael D. Shumsky (495078)
                                         John K. Crisham (486491)
                                         KIRKLAND & ELLIS LLP
                                         655 15th Street N.W., Suite 1200
                                         Washington, D.C.  20005
                                         Tel: (202) 879-5000
                                         Fax: (202) 879-5200

                                         *Counsel for Teva Pharmaceuticals USA, Inc.
                                         and Cephalon, Inc.*

### CERTIFICATE OF SERVICE

The undersigned certifies that on this 3rd day of April, 2012, he caused a copy of the foregoing **TEVA PHARMACEUTICALS USA, INC. AND CEPHALON, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR JOINT MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** to be served upon the following attorneys by electronic mail:

> Elizabeth Dickinson, Esq.
> Chief Counsel, U.S. Food and Drug Administration
> Shoshana Hutchison, Esq.
> Associate Chief Counsel, Litigation
> U.S. Department of Health and Human Services
> 5600 Fishers Lane
> Rockville, MD 20857
> (301) 827-8579
> Email: Elizabeth.Dickinson@fda.hhs.gov
> Email: Shoshana.Hutchison@fda.hhs.gov
>
> Drake Cutini, Esq.
> Roger Gural, Esq.
> United States Department of Justice
> Office of Consumer Litigation
> Liberty Square Building
> 450 5th Street, NW
> Room 4600 S
> Washington, D.C. 20001
> Email: Drake.Cutini@usdoj.gov
> Email: Roger.Gural@usdoj.gov

*Counsel for the Federal Defendants*

/s Michael D. Shumsky
Michael D. Shumsky
*Counsel for Teva Pharmaceuticals USA, Inc.
and Cephalon, Inc.*