## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
MYLAN PHARMACEUTICALS INC.,    )
    )
    Plaintiff,    )
    )
    v.    )    Civil Action No. 12-524 (ESH)
    )
KATHLEEN SEBELIUS, Secretary of    )
  Health and Human Services, *et al*.,    )
    )
    Defendants.    )
———————————————————————— )

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
### FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Mylan Pharmaceuticals, Inc. ("Mylan"), is challenging Teva Pharmaceuticals USA, Inc.'s ("Teva"), marketing exclusivity for generic Provigil (modafinil), a drug used to treat sleep disorders such as narcolepsy and sleep apnea. In its Motion for a Preliminary Injunction, Mylan has asked this Court to order the Food and Drug Administration ("FDA") to revoke Teva's exclusivity and immediately approve Mylan's abbreviated new drug application ("ANDA"). However, FDA properly applied the relevant provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA") in concluding that Teva was entitled to exclusivity in connection with its application for generic modafinil. Because Mylan has failed to show that FDA erred in awarding Teva exclusivity, it is not entitled to the extraordinary remedy of preliminary injunctive relief.

### STATUTORY AND REGULATORY BACKGROUND

### I.     NEW DRUG APPLICATIONS

Under the FDCA, pharmaceutical companies seeking to market "pioneer" or "innovator" drugs must first obtain FDA approval by filing a new drug application ("NDA") containing

extensive scientific data demonstrating the safety and effectiveness of the drug.  21 U.S.C.

§ 355(a), (b).  An NDA applicant must also submit information on any patent that claims the

drug, or a method of using the drug, and for which a claim of patent infringement could

reasonably be asserted against an unauthorized party.  21 U.S.C. § 355(b)(1), (c)(2).  FDA must

publish the patent information it receives, and does so in "Approved Drug Products with

Therapeutic Equivalence Evaluations" (the "Orange Book").  *Id.*; *see also* 21 C.F.R. § 314.53(e).

## II.    ABBREVIATED NEW DRUG APPLICATIONS

The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-

Waxman Amendments"), codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271, and 282,

permits manufacturers to submit ANDAs requesting approval of generic versions of approved

drug products.  21 U.S.C. § 355(j).  The Hatch-Waxman Amendments were intended to balance

encouraging innovation in the development of new drugs with accelerating the availability to

consumers of lower cost alternatives to such drugs.  *See* H.R. Rep. No. 98-857 (Part I), 98th

Cong., 2d Sess. at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647-48; *see also*, *e.g.*, *Tri-Bio

Labs., Inc. v. United States*, 836 F.2d 135, 139 (3d Cir. 1987).

ANDA applicants need not submit clinical data to demonstrate the safety and efficacy of

the generic product, as is necessary with an NDA.  *See* 21 U.S.C. § 355(j).  Rather, an ANDA

relies on FDA's previous findings that the product approved under the NDA is safe and effective.

The FDCA sets forth in detail the information an ANDA must contain.  *See* 21 U.S.C.

§ 355(j)(2)(A).  Among other information, an ANDA must include data showing that the generic

drug product is bioequivalent to the pioneer drug product.  21 U.S.C. § 355(j)(2)(A)(iv),

(j)(4)(F); 21 C.F.R. §§ 314.127(a)(6)(i), 314.94(a)(7).  A drug is considered to be bioequivalent

if "the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug . . . ." 21 U.S.C. § 355(j)(8)(B)(i).

### A.     Patent Protections and 180-Day Exclusivity

The timing for approval of ANDAs depends, in part, on statutory patent protections afforded to the innovator drug.  Among other things, an ANDA must contain one of four specified certifications for each patent that "claims the listed drug" or claims "a use for such listed drug for which the applicant is seeking approval."  21 U.S.C. § 355(j)(2)(A)(vii).

This certification must state one of the following:

(I)    that such patent information has not been filed,
(II)   that such patent has expired,
(III)  . . . the date on which such patent will expire, or
(IV)  that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

21 U.S.C. § 355(j)(2)(A)(vii).  If a certification is made under paragraph I or II indicating, respectively, that patent information pertaining to the drug or its use has not been filed with FDA or that the patent has expired, the ANDA may be approved immediately.  21 U.S.C. § 355(j)(5)(B)(i).  A paragraph III certification indicates that the ANDA applicant does not intend to market the drug until after the applicable patent has expired, and approval of the ANDA may be made effective on the expiration date.  21 U.S.C. § 355(j)(5)(B)(ii).

If an applicant wishes to challenge the validity of a patent, or to claim that the patent would not be infringed by the product covered by the ANDA, the applicant must submit a certification pursuant to paragraph IV.  *See* 21 U.S.C.  § 355(j)(2)(A)(vii)(IV).  The applicant must also provide notice of its paragraph IV certification to the NDA holder and the patent owner explaining the factual and legal basis for the applicant's opinion that the patent is invalid or not infringed.  21 U.S.C. § 355(j)(2)(B).

The filing of a paragraph IV certification "for a drug claimed in a patent or the use of which is claimed in a patent" is an act of infringement.  35 U.S.C. § 271(e)(2)(A).  This enables the NDA holder and patent owner to sue the ANDA applicant.  If such a suit is brought within 45 days of the date when notice of the certification was received by the patent owner or NDA holder, FDA must stay approval of the ANDA for 30 months from that date (commonly referred to as the "30-month stay"), unless a final court decision is reached earlier in the patent case or the court orders a longer or shorter period.  21 U.S.C. § 355(j)(5)(B)(iii).  If no action is brought within the 45-day period, FDA may approve an ANDA with a paragraph IV certification effective immediately, provided that other conditions for approval have been met.  21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(f)(2).

The statute also provides an incentive and reward to generic drug manufacturers that expose themselves to the risk of patent litigation.  It does so by granting, in certain circumstances, a 180-day period of marketing exclusivity *vis-a-vis* other ANDA applicants to the manufacturer who is first to file an ANDA containing a paragraph IV certification to each listed patent.  21 U.S.C. § 355(j)(5)(B)(iv); *see Mylan Pharm. Indus. v. Crawford*, 410 F.3d 51, 52-53 (D.C. Cir. 2005); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1064 (D.C. Cir. 1998).  The statutory provisions in existence when the modafinil ANDAs were filed[1] provide that a first applicant's exclusivity can be triggered by the earlier of (I) the ANDA applicant's first commercial marketing of the drug (the "commercial marketing trigger"), or (II) a decision of a

---

[1] Because the modafinil ANDAs were filed before the date of enactment of the Medicare Prescription Drug, Improvement and Modernization Act (the "MMA"), Public Law 108-173, 117 Stat. 2066  (Dec. 8, 2003), the 180-day exclusivity provisions (and implementing regulations) are those that were in effect prior to December 8, 2003.  *See* MMA § 1102(b)(1).  Citations to the FDCA in this brief refer to the version of the statute as it existed prior to December 8, 2003, unless otherwise noted.

court finding the patent at issue invalid or not infringed (the "court decision trigger").  21 U.S.C. § 355(j)(5)(B)(iv).

### B.        Tentative and Final ANDA Approval

FDA grants "tentative approval" to an ANDA when all scientific and procedural conditions for approval have been met, but the application cannot be fully approved because approval is blocked by a 30-month stay, some form of marketing exclusivity, or some other barrier to approval arising from patent infringement litigation.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA); *see generally Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 245-50 (D.D.C. 2002).  An application with a tentative approval will not become finally approved—and the drug may not be legally marketed—until the agency issues a final approval letter.  *See* 21 C.F.R. § 314.105(d); 21 C.F.R. § 314.107(b)(3)(v); s*ee also Ranbaxy Labs. Ltd. v. FDA*, 307 F. Supp. 2d 19, 21 (D.D.C. 2004) ("Approvals do not become effective by operation of law because the FDA has an ongoing health and safety responsibility to perform.").

Any number of events occurring after FDA gives its tentative approval to an ANDA may prevent or delay final approval.  For example, inspections after tentative approval may reveal manufacturing deficiencies, or standards governing impurity levels may change, or FDA may have approved a material change to the formulation or labeling of the pioneer drug, which would require comparable changes by the ANDA applicant.  When an ANDA is ready for final approval, FDA must carefully re-review it for any changes that may have occurred after tentative approval was given before the agency will issue the final approval letter.  *See* 21 U.S.C. § 355(j)(4)(A)-(K) (findings precluding approval); 21 C.F.R. § 314.127 (same).  Thus, notwithstanding an ANDA's tentative approval, final approval does not follow automatically at the moment exclusivity expires.

Further, a "tentative approval" is not a final determination of an ANDA's labeling. Tentative approvals are based only on draft labeling. It may be months or even years between a tentative and final approval, and the labeling may be required to change in the interim, particularly if the innovator makes changes and the agency must evaluate how those changes impact the draft ANDA labeling. ANDA applicants with tentative approvals are requested to update the labeling approximately 60 to 90 days before final approval.

## FACTUAL BACKGROUND

Cephalon, Inc. ("Cephalon") holds the NDA for Provigil, which was approved on December 24, 1998. *See* Letter from FDA to Teva (dated April 4, 2012) at 2 (attached hereto as Exhibit A). On October 14, 2011, Cephalon became a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd.[2] *Id.* at 1.

The Orange Book lists two patents for Provigil: U.S. Patent No. RE37,516 ("the '516 patent") and U.S. Patent No. 7,297,346 ("the '346 patent"). *See* Ex. A at 2-3.[3] On the first date on which ANDAs referencing Provigil were eligible for submission, December 24, 2002, several companies submitted ANDAs that contained paragraph IV certifications to the '516 patent. *Id.* at 2. In 2003, Cephalon sued the ANDA applicants for infringement of the '516 patent, and in late 2005 and early 2006, the parties entered into settlement agreements under which Cephalon dismissed its patent infringement suit and each of the ANDA applicants agreed not to market their generic products until April 6, 2012. *Id.* at 3. Teva submitted a paragraph IV certification to the '346 patent on December 14, 2007, and, in so doing, qualified as a first-filer to this patent.

---

[2] For ease of reference, "Teva" will be used in this brief to refer to both the parent and subsidiary Teva companies.

[3] The '516 patent was listed in 2001 and expires on October 6, 2014, (the pediatric exclusivity attached pursuant to 21 U.S.C. § 355A expires on April 6, 2015). The '346 patent was listed on December 14, 2007, and expires on November 29, 2023, (the pediatric exclusivity expires on May 29, 2024). *See* Mylan PI Ex. 2.

*See* Ex. A at 3.  Teva's modafinil ANDA was tentatively approved on December 16, 2005, but has not, to date, received final approval.

As a result of Teva's acquisition of Cephalon, Teva currently markets both Provigil and an authorized[5] generic modafinil through the Cephalon NDA.  Ex. A at 3.[6]  In addition, under a draft FTC decision and order, Teva agreed to provide Par Pharmaceuticals with adequate supplies to market an authorized generic modafinil product for one year and, at Par's option, for an additional year.  *Id.* at 3 and n.9.

Mylan first received tentative approval of its modafinil ANDA on February 9, 2005.  *See* Mylan PI Ex. 2 at 1.  In its April 4, 2012, letter to Mylan, FDA informed Mylan that the agency had concluded its review of Mylan's ANDA and found Mylan's generic drug product to be safe and effective.  *See* Mylan PI Ex. 2 at 1.  FDA explained, however, that Mylan's ANDA remained only tentatively approved because another ANDA applicant was entitled to 180-day exclusivity.  *Id.* at 2.  FDA also explained that the other applicant triggered its exclusivity period on March 30, 2012, and that Mylan's ANDA will be eligible for final approval on September 26, 2012, when the exclusivity period expires.  *See* Mylan PI Ex. 2 at 2.

---

[5] An authorized generic drug is "a listed drug . . . that has been approved under [an NDA] and is marketed, sold, or distributed directly or indirectly" for retail whose labeling, packaging, product code, labeler code, trade name, or trademark "differ[] from that of the listed drug."  21 C.F.R. § 314.3(b); *see also* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf (discussing the interplay of authorized generics and 180-day exclusivity granted to ANDAs).

[6] When FDA sent its April 4, 2012, letter to Teva, Provigil was listed on Teva Pharmaceuticals USA's website as one of "Teva's Brand Products."  *See* Ex. A at 1, n.2 (citing http://www.tevausa.com/default.aspx?pageid=345&audience=hcp).  Currently, however, Provigil is not listed on what appears to be the same page of Teva's website (http://www.tevausa.com/default.aspx?pageid=3535&audience=hcp).  The lack of clarity on Teva's own website underscores the confusion that can arise when related companies market different versions of the same drug product.

**ARGUMENT**

Preliminary injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 21 (2008); *Munaf v. Geren*, 553 U.S. 674, 690 (2008); *see also Mpoy v. Fenty*, 674 F. Supp. 2d 163, 165 (D.D.C. 2009) ("Injunctive relief is an extraordinary remedy, and plaintiff bears a substantial burden to obtain it.").  To obtain a preliminary injunction, a party must establish that:  (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction would serve the public interest.  *Winter*, 555 U.S. at 20.

It is "particularly important" for a movant to demonstrate likely success on the merits. *Astellas Pharma US, Inc., v. FDA*, 642 F. Supp. 2d 10, 16 (D.D.C. 2009) (absent "substantial indication" of likely success, there would be no justification for court's intrusion into ordinary processes of administration and judicial review).  Moreover, a party seeking preliminary injunctive relief must demonstrate an actual "likelihood" of success on the merits, not merely the existence of "questions so serious, substantial, difficult and doubtful, as to make them fair ground for litigation . . . ."  *Munaf*, 553 U.S. at 690 (citations omitted).  Nor is a mere "possibility" of irreparable harm sufficient to justify such relief:

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. . . . Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

*Winter*, 555 U.S. at 21 (citations omitted, emphasis in original).

In this case, Mylan's burden is even higher, because it seeks not to preserve the *status quo*, but to instead obtain an order requiring immediate approval of its ANDA.  A court's power

to issue such a mandatory injunction "should be sparingly exercised." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000).

## I.  MYLAN HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  Arbitrary and Capricious Standard of Review

FDA's administrative decisions are subject to review under the Administrative Procedure Act ("APA"), and may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is highly deferential to the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The agency's administrative decision is entitled to a presumption of validity. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The reviewing court must consider whether the agency's decision was based upon consideration of the relevant factors and whether there has been a clear error of judgment. *Overton Park*, 401 U.S. at 416. However, a reviewing court is "not empowered to substitute its judgment for that of the agency," *id.,* and must uphold the agency's action so long as it is "rational, based upon consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n, Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-42 (1983).

Moreover, in reviewing the FDA's interpretation of the FDCA, the Court is governed by the familiar two-step analysis of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The first question under *Chevron* is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If, however—as here—the statute "is silent or ambiguous with respect to the specific issue," the Court proceeds to the second prong of *Chevron*, under which "the question for the court is whether the agency's answer is based on a

permissible construction of the statute." *Chevron*, 467 U.S. at 843; *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1012-13 (D.C. Cir. 1999).  The court need not find that the agency construction was the only one it permissibly could have adopted or even the reading the court would have reached; so long as the agency's reading is permissible, it must be sustained.  *See Chevron*, 467 U.S. at 843-44 & n.11; *County of Los Angeles*, 192 F.3d at 1012-13.  The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."  *United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001), quoting *Chevron*, 467 U.S. at 844; *see also Udall v. Tallman*, 380 U.S. 1, 16 (1965); *County of Los Angeles*, 192 F.3d at 1013; *Orengo Caraballo v. Reich*, 11 F.3d 186, 192-93 (D.C. Cir. 1993).  Deference is appropriate when "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue."  *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).  *Chevron* deference is appropriate for FDA's decision in this case.  *See Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004) (*Chevron* deference extended to agency decision made in a letter).

### B.  Mylan Has Not Shown That FDA Erred in Granting Teva Exclusivity

FDA determined that Teva was the first ANDA applicant to file a paragraph IV certification to both the '516 and the '346 patents; therefore the FDCA mandated that FDA delay approval of subsequent modafinil ANDAs.  Specifically, the FDCA provided Teva exclusivity by delaying approval of later-filed ANDAs that contain paragraph IV certifications—here,

Mylan—until 180 days after the exclusivity is triggered.  *See* 21 U.S.C. § 355(j)(5)(B)(iv).

Mylan contends that once Teva acquired Cephalon, Teva's paragraph IV certifications "ceased to have any legal effect and no longer could properly serve as a basis for an award of 180-day exclusivity."  Mylan's Mem. in Supp. of its Mot. for a Prelim. Inj. ("Mylan PI Memo") at 6.  But Mylan's argument makes a leap that lacks support in both the FDCA and FDA's existing regulations.

It is likely that Teva's acquisition of Cephalon diminishes Cephalon's ability to now bring a patent infringement case against Teva—if Cephalon is even interested in doing so— based on Teva's paragraph IV certifications to patents owned by Cephalon.  However, prior to Teva's acquisition, Cephalon *did* sue Teva for patent infringement and the case was settled.  *See* Ex. A at 3.[8]  Irrespective of Teva's past or current litigation posture with respect to Cephalon, Teva is entitled to the statutory reward of exclusivity for becoming the first modafinil ANDA applicant to subject itself to the risk of a patent infringement suit.  21 U.S.C. § 355(j)(5)(B)(iv). Moreover, section 355(j)(5)(B)(iv) and the FDA regulations that govern exclusivity are silent regarding the corporate relationship between an NDA and ANDA holder.  Mylan attempts to read into the statute and regulations a bar on non-arms-length relationships between innovator and generic companies when no such bar exists under the law.  Notably absent from Mylan's brief are citations to the FDCA or FDA's regulations mandating that FDA withhold exclusivity from an ANDA applicant based on the applicant's relationship to the NDA holder formed *after* the ANDA applicant filed a paragraph IV certification and was sued by the NDA holder.

FDA understands Mylan's concerns, Mylan PI Memo at 8.  Granting exclusivity to a generic manufacturer that is owned by the innovator manufacturer appears to thwart the Hatch-

---

[8] Mylan's reliance on cases that discuss the relationship necessary for parties to be sufficiently adverse as to provide a court with jurisdiction, *see* Mylan PI Memo at 7-8, is thus misplaced.

Waxman Amendments' goal of bringing more generic drugs to market faster (*i.e.*, because the generic manufacturer would have no incentive to compete against its related innovator manufacturer, or the generic could sit on its exclusivity indefinitely by not commencing commercial marketing of its product—which would trigger the start of the 180-day exclusivity period—thereby blocking any other generics from coming to market).  *See*, *e.g.*, Ex. A at 7, n.18 ("Because of the potential for collusion between NDA holders and captive first generics, and the subversion of the statutory scheme that could result, the agency may in the future provide guidance on the effect of such a relationship between NDA holder and first applicant upon any claim for 180-day exclusivity.").[9]  Nonetheless, final approval of Mylan's ANDA hinges only on whether a previous ANDA was submitted containing a paragraph IV certification and the 180-day exclusivity period had run.  *See* 21 U.S.C. § 355(j)(5)(B)(iv).  FDA determined that Teva filed the first ANDA with paragraph IV certifications to both listed Provigil patents and therefore granted Teva exclusivity.  Mylan has failed to show that Teva's paragraph IV certifications should be disregarded or that FDA otherwise erred in concluding that Teva is entitled to exclusivity for its modafinil ANDA.

Mylan's contention that the agency acted contrary to an FDA regulation by not finding that Teva abandoned its ANDA, *see* Mylan PI Memo at 12, is similarly unavailing.  21 C.F.R. § 314.107(c)(3) provides, "if FDA concludes that the applicant submitting the first [ANDA] is not actively pursuing approval of its [ANDA], FDA will make the approval of subsequent [ANDAs] immediately effective" if those ANDAs are otherwise eligible for approval.  By letter

---

[9] Here, full generic competition will begin on September 26, 2012, because FDA determined that Teva triggered its exclusivity when it launched an authorized generic version of modafinil tablets on March 30, 2012.  *See* Ex. A at 6-8.

dated March 30, 2012,[10] Teva made a submission to its modafinil ANDA.  *See* Ex. A at 7, n.21.

While this submission was the first activity Teva initiated in over two years in pursuit of

approval of its ANDA, it nonetheless suffices to counter Mylan's assertion that Teva abandoned

its ANDA.

## II.    MYLAN HAS NOT SHOWN THAT IT WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF

Mylan has also failed to demonstrate that it will suffer irreparable harm absent injunctive

relief or that the balance of hardships tips in its favor.  Courts insist that only *irreparable* harm

that is *likely* to occur justifies the issuance of a preliminary injunction.  *Winter*, 555 U.S. at 21.

Indeed, "if a party fails to make a sufficient showing of irreparable injury, the court may deny

the motion for injunctive relief without considering the other factors."  *Astellas*, 642 F. Supp. 2d

at 16.  As Judge Kavanaugh has pointed out, "the *Winter* Court rejected the idea that a strong

likelihood of success could make up for showing only a possibility (rather than a likelihood) of

irreparable harm.  In other words, the Court ruled that the movant always must show a likelihood

of irreparable harm."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir.

2009) (Kavanaugh, J., joined by Henderson, J., concurring).  Irreparable injury is a "very high

standard."  *Ark. Dairy Coop., Inc. v. USDA*, 576 F. Supp. 2d 147, 160 (D.D.C. 2008); *Bristol-

Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 220 (D.D.C.1996).  The injury alleged must be

certain, great, actual, and imminent, *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985),

and it must be "more than simply irretrievable; it must also be serious in terms of its effect on the

plaintiff."  *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981).

In this circuit, mere economic loss—even irrecoverable economic loss, such as Mylan

---

[10] FDA received Teva's submission on April 2, 2012, as reflected in FDA's April 4, 2012, Letter to Teva.  *See* Ex. A at 7, n.21.

alleges here—does not constitute irreparable harm unless the financial injury is so great as to

threaten the continued existence of the movant's business:

> To satisfy the standard of irreparable injury to justify a preliminary injunction, the movants' loss must be "more than simply irretrievable."  *Mylan Labs., Inc. v. Thompson*, 139 F. Supp. 2d 1, 27 (D.D.C. 2001); *see also Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Instead, the injury must be such that it "cause[s] extreme hardship to the business, or even threaten[s] destruction of the business."  *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981); *see also, Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26 (D.D.C. 2006) (noting that "[t]o successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence.").

*Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 123 (D.D.C. 2007); *see also Astellas*, 642 F.

Supp. 2d at 22 ("it is well-settled that economic loss alone will rarely constitute irreparable

harm"); *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) ("In this

jurisdiction, harm that is 'merely economic' in character is not sufficiently grave under this

standard."); *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d

162, 168-69 (D.D.C. 2008) (finding that "degree of harm" asserted by coalition of

pharmaceutical manufacturers did not approach "the level required in this case (*i.e.* so severe as

to cause extreme hardship to the business or threaten the very existence of Coalition members)");

*Apotex, Inc. v. FDA*, No. 06-0627 (JDB), 2006 WL 1030151 (D.D.C. Apr. 19, 2006) at *17

(where plaintiff did not establish that lost sales and market share would cause "extreme

hardship" to company, claim of harm fell "well short of the serious, irretrievable damage to its

business required to warrant a preliminary injunction"); *Sociedad Anonima Vina Santa Rita v.*

*Dep't of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001) ("financial harm alone cannot constitute

irreparable injury unless it threatens the very existence of the movant's business").

Thus, in order to prevail on a motion for preliminary injunctive relief, Mylan must make

"a strong showing" that any economic loss it would suffer in the absence of such relief "would

14

significantly damage its business above and beyond a simple diminution in profits." *Mylan v. Shalala*, 81 F. Supp. 2d at 42-43; *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n. 3 (D.C. Cir. 1977) ("The mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact.").

Mylan does not come close to satisfying this standard.  Mylan's claimed irreparable harm is that any delay in approval would "undermine the value of Mylan's significant investments in its modafinil product," cause Mylan to lose sales and revenue, and render Mylan's efforts to have product on hand on April 6 "for naught."  Mylan PI Memo at 13-14.  Notably, Mylan is not claiming that it is entitled to exclusivity *instead* of Teva but only that Mylan should be one of the generics immediately on the market.  *See*, *e.g.*, *id.* at 13 ("There will be considerable disadvantages if Mylan misses out on the opportunity to be among the first generics on the market.").  In short, even if Mylan were to lose some portion of its sales of generic modafinil as a result of Teva's exclusivity, Mylan has not shown that the resulting financial harm would be so significant as to cause "extreme hardship," much less threaten Mylan's existence.  Indeed, Mylan does not claim that the purported harm it will suffer in the absence of preliminary relief will threaten the company's existence.  All generic manufacturers know from the outset that a grant of exclusivity to one generic manufacturer will delay sales and profit to all other generic manufacturers of that product; this economic fact of life does not justify entry of extraordinary injunctive relief.

Nor does Mylan make any attempt to quantify either the actual loss it may suffer, or the percentage of its annual profits it may lose, due to Teva's grant of exclusivity.  Mylan simply states that it "expects to capture a substantial percentage of modafinil product sales" if allowed to launch immediately, and that delay in approval will cause Mylan "lost sales" and "diminished

share of sales."  Mylan PI Memo at 13.  Mylan's general conclusion that it might lose some

unspecified amount of future revenue hardly demonstrates a concrete likelihood of imminent and

irreparable injury.[11]  Moreover, "[m]onetary figures are relative, and depend for their ultimate

quantum, on a comparison with the overall financial wherewithal of the corporation involved."

*Mylan v. Leavitt*, 484 F. Supp.2d at 123.  When, as here, a company seeking preliminary relief

does not establish that its alleged losses "would threaten the continued existence of [its]

business," it "fail[s] to demonstrate irreparable injury."  *Id*.  Mylan, with gross profits for 2011

exceeding $2.5 billion dollars, s*ee* Mylan Inc. Annual Report (*available at*

http://investor.mylan.com/secfiling.cfm?filingID=1193125-12-70508), can make no such claim.

This is especially true considering the fact that there is already at least one authorized generic on

the market.

      For all of these reasons, Mylan cannot meet its burden of establishing that it will suffer

irreparable injury in the absence of preliminary injunctive relief.

## III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH AGAINST THE ENTRY OF PRELIMINARY INJUNCTIVE RELIEF

      Mylan has also failed to show that any harm it may suffer in the absence of injunctive

relief outweighs the potential harm to FDA and the public.  Although FDA has no commercial

stake in the outcome of this litigation, FDA's interest and the public's interest in generic drug

approvals are the same.  *See Serono Labs., Inc., v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998)

(determining that the public interest is "inextricably linked" to Congress's purpose in passing the

---

[11] There is no reason to believe that Mylan's business will be "significantly damage[d]" by lost sales over the likely 3-4 month duration of this litigation.  *Mylan v. Shalala*, 81 F. Supp. 2d at 43; *see also Apotex*, 2006 WL 1030151 at *17 ("the actual relevant period for assessing harms is probably only a few months"—from the time of generic launch to the time the case is resolved on the merits); *Bristol-Myers*, 923 F. Supp. at 221 ("If it ultimately prevails on the merits, Bristol's total sales will be insignificantly affected over the duration of the litigation.").

Hatch-Waxman Amendments).  FDA must implement the statutory scheme governing the approval of generic drugs in the manner outlined by Congress in the FDCA.  In addition, granting first-filers marketing exclusivity encourages generic manufacturers to challenge patents that might otherwise prevent generic products from coming to market, which ultimately benefits the public.

In addition, any financial harm that Mylan would incur in the absence of a preliminary injunction will be matched, if not exceeded, by the financial harm that Teva will suffer by being deprived of its right to marketing exclusivity during the period that a preliminary injunction is in effect.  The D.C. Circuit has found in similar circumstances that the balance of harms "results roughly in a draw."  *Serono*, 158 F.3d at 1326; *see also Bristol-Myers*, 923 F. Supp. at 221 (noting that generic company had "endured a seven year process to obtain FDA approval" and that "the effect of an injunction [on the generic company] . . . would be dramatically greater" than the harm to plaintiff); *cf. Ark. Dairy Coop.,* 576 F. Supp. 2d at 161 (noting that any harm plaintiffs would suffer absent preliminary injunctive relief would be offset by substantial harm to defendant-intervenors if injunction were granted).

## CONCLUSION

For the foregoing reasons, Mylan's Motion for a Preliminary Injunction should be denied.

Respectfully submitted,

Of Counsel:

WILLIAM B. SCHULTZ                     STUART F. DELERY
Acting General Counsel                 Assistant Attorney General

ELIZABETH H. DICKINSON                 MAAME EWUSI-MENSAH FRIMPONG
Associate General Counsel              Acting Deputy Assistant Attorney General
Food and Drug Division
                                       MICHAEL S. BLUME
ERIC M. BLUMBERG                       Director
Deputy Chief Counsel, Litigation

SHOSHANA HUTCHINSON
Associate Chief Counsel, Litigation    /s/  Roger Gural
U.S. Dept. of Health & Human Services  ROGER GURAL
Office of the General Counsel          Attorney
10903 New Hampshire Ave.               Consumer Protection Branch
White Oak 31, Room 4560                Civil Division
Silver Spring, MD 20993-0002           U.S. Department of Justice
301-796-8566                           P.O. Box 386
                                       Washington, D.C. 20044
                                       202-307-0174
                                       Roger.Gural@usdoj.gov

April 10, 2012